Fremont-Smith, J.
This case alleges G.L.c. 2 IE, negligence, trespass, nuisance and strict liability claims which arise out of the groundwater contamination of plaintiffs real estate in Woburn, Massachusetts, which contamination, it is alleged, is emanating from the defendants’ nearby properties. Both defendants have moved for summary judgment on the ground that plaintiffs knew or should have known of the injury to their contaminated properties[2] more than three years prior to the filing of this action, whereas the plaintiffs assert that they did not have adequate notice and that in any event the continuing migration *430 of contaminants onto their properties constitutes a “continuing tort” which tolls the statute.
Defendants have further moved for summary judgment in regard to plaintiffs’ other, uncontaminated properties on the ground that plaintiffs have shown no cognizable injury in regard thereto.
Finally, defendants have moved for summary judgment to avoid their contractual obligations to indemnify the plaintiffs for investigatory, removal and remedial costs, on the ground that their agreements to that effect were induced by plaintiffs’ misrepresentations concerning the environmental condition of Cummings’s properties or were the product of mutual or unilateral mistake. Additionally, defendants have counterclaimed for recovery or contribution pursuant to G.L.c. 2IE, G.L.c. 93A and G.L.c. 23 IB, and a declaratory judgment pursuant to G.L.c. 231A, whereas plaintiffs have asserted a cross-motion for summary judgment on these counterclaims.
For the reasons stated below, the Court grants, in their entirety, defendants’ motions for summary judgment. The Court further enters summary judgment for the plaintiffs with regard to defendants counterclaims which allege fraud and misrepresentation, violation of G.L.c. 93A, unilateral and mutual mistake, and which seek contribuí:;n. The Court denies plaintiffs’ motion for summary judgment on defendants’ counterclaims which allege violations of G.L.c. 2 IE and allows in part and denies in part plaintiffs’ motion for summary judgment on defendants’ counterclaims for unjust enrichment.
BACKGROUND
On April 21, 1988, Cummings entered into a tolling agreement with W.R. Grace which tolled the statute of limitations on any then-viable claim of Cummings for a period of three years, and thus permitted a later filing of any cause of action which had not accrued before April 21, 1985.[3] On September 2, 1988, Cummings entered into a similar agreement with UniFirst, and thus permitted a later filing of a cause of action which had not accrued before September 2, 1985. This action was filed on April 18, 1991, within three years of expiration of the tolling agreement, but defendants contend that the cause of action had accrued before April 21, 1985, and is thus time-barred.
Cummings argues that under Massachusetts’ “discovery rule” its cause of action did not accrue until, at the earliest, 1986, when it first knew with any certainty that it had been injured by the defendants. Alternatively, Cummings argues that the statute was tolled under a “continuing tort” theory, because contaminated groundwater continues to migrate from defendants’ property onto plaintiffs property up to and including the present time.
DISCUSSION
I. Whether Continuing Migration of Contaminants From Defendants’ Properties Constitutes a “Continuing Tort”
A moving party is entitled to summary judgment as a matter of law where there are no material facts in dispute, i.e., facts upon which a jury could reasonably decide the issue in favor of the nonmoving party. This is true with respect to the statute of limitations defense where there is no dispute as to essential evidentiary facts controlling the application of the statute. Catrone v. Thoroughbred Racing Associations of North America, 929 F.2d 881 (1st Cir. 1991), citing Fidler v. E.M. Procker Co., 394 Mass. 534 (1985).
Here, the defendants assert that, since it is undisputed that no releases from underground storage tanks of the defendants have occurred since before April 21, 1985 (as all such storage tanks had by then been removed) the cause of action clearly accrued prior thereto, so that any action for recovery of damages was barred when the action was filed in 1991.
Plaintiff counters that, even though the tanks had been removed, it is nevertheless undisputed that contaminated groundwater has continued to migrate from defendants’ properties onto the plaintiffs property up to the present time, so that there is a “continuing tort” which tolls the statute.
There are, indeed, several Superior Court decisions which have so held. See, e.g., “Memorandum of Decision and Order on Defendant Cambridge Savings Bank Motion for Summary Judgment on All Counts/Claims” in John Nestor, Trustee of Shannon Development Trust v. Haley & Aldrich, Inc., and others, Civil Action No. 90-3618 (February 3, 1992).
As stated in the court’s decision in Hartong v. Sun Refining and Marketing Co., 1 Mass. L. Rptr. No. 3, 61 (September 27, 1993), however, the court is unpersuaded that this is an appropriate application of the “continuing trespass" rule. Since contaminated groundwater frequently continues to migrate in groundwater for many years, if not for decades, such an application of the “continuing trespass” rule would effectually defeat the purpose of the statute of limitations, with the result that in environmental cases, “there seldom would be a prescribed and predictable period of time after which a claim would be barred.” Olsen v. Bell Telephone Laboratories, Inc., 388 Mass. 171, 175 (1983).
Nor is this Court persuaded that such a result is supported by the decisions of the Supreme Judicial Court. In Sixty-eight Devonshire, Inc. v. Shapiro, 348 Mass. 177 (1964), the Supreme Judicial Court rejected just such an argument on analogous facts. There, a broken downspout on defendant’s building continually discharged water, ice and snow into the plaintiffs property. The Court stated that the statute would be tolled, but only because “damage to the plaintiffs building caused by the discharge of water from the defective gutter was a recurring event which continued *431 down to the time the action was brought,” Id. at 184. See also Ahem v. Warner, 16 Mass.App.Ct. 223 (1983), where the Court affirmed the principle that the statute will be tolled only where a distinct act causing renewed injuiy has occurred within the period of limitations.
Although the precise point seems to have been rarely addressed in reported environmental decisions, in Merry v. Westinghouse Electric Corp., 684 F.Supp. 852 (M.D. Pa. 1988), the court rejected plaintiffs argument that the statute was tolled because defendant’s injury, caused by migration of contaminants, was of a continuing nature, and said (at 855):
The continuing trespass must be distinguished from a trespass that effects a permanent change in the condition of the land. The latter, while resulting in a continuing harm, does not subject the trespasser to liability for a continuing trespass. See Restatement of Torts, §162, comment (d). If a nuisance at the time of creation is a permanent one, the consequences of which in the normal course of things will continue indefinitely, there can be but a single action therefore to recover past and future damages when the statute of limitations runs against such cause of action from the time it first occurred, or at least from the date it should reasonably have been discovered.
The court went on to note, “(t]hus, the issue of whether the statute of limitations is tolled turns on whether the injuries in this case are of a permanent nature, or conversely, can be characterized as separate and recurrent injuries.” Id. at 855-56. The court found that additional discovery was necessary in order to determine whether the defendant had improperly disposed of chemicals at any time within the statute of limitations. Id. See also DeVos v. General Electric Co., Civil Actin No. 90-30034-F, slip opinion at 6-9 (D.Mass. June 11, 1992), where, in construing G.L.c. 2 IE, the court held that “the fact that plaintiff has alleged that she has suffered ongoing injuries because the contaminants have not been removed from her property does not necessarily transform this action into a continuing tort. Kirley v. Kirley, 25 Mass.App.Ct. 651, 655 (1988).”
For these reasons, this Court concludes that, where, as here, it is undisputed that there was no recurring release of contaminants from storage tanks onto plaintiffs’ properties or into the groundwater under plaintiffs’ properties within the statutory period (i.e., after April21,1985) the doctrine of “continuing trespass” should not be applied so as to toll the statute of limitations, unless the contamination-caused injuiy was not, in the exercise of due diligence, reasonably discoverable by the plaintiffs during the statutory period.[4]
II. Whether Cummings Knew or Should Have Known of the Injury to his Property Prior to April 21,1985
The parties do not dispute that all contamination caused by the defendants (other than the continuing migration of contaminants in groundwater discussed above) occurred prior to the April 18, 1985 statute of limitations cut-off date. What is disputed is whether or not Cummings had sufficient notice prior thereto to bar this action.
Cummings argues that the question of what it knew or should have known regarding the cause of the injury, is a factual issue which should not be decided on summary judgment, because there is a strong preference for permitting a jury to decide factual issues concerning a party’s state of mind. See Riley v. Presnell 409 Mass. 239, 243 (1991); G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 276, n.4 (1991) (citations omitted). It is well settled, however, that a party against whom summary judgment is sought is not entitled to a trial simply because he asserts a cause of action in which his state of mind is at issue. Rather, to avoid summary judgment, the plaintiff must indicate that he can produce the requisite quantum of evidence to enable him to reach the jury with his claims.[5] National Association of Government Employees, Inc. v. Central Broadcasting Co., 379 Mass. 220, 231 (1979) (quoting Hahn v. Sargent, 523 F.2d 461, 469 (1st Cir. 1975), cert. den, 425 U.S. 904 (1976).
Moreover, as noted below, the issue is not simply one of Cummings’s state of mind (what Cummings knew), but rather what it reasonably should have known. In these circumstances, summary judgment has been found to be appropriate in a number of Massachusetts cases. Riley v. Presnell 409 Mass. 239 (1991); Bowen v. Eli Lilly & Co., 408 Mass. 204 (1990); Malapanis v. Shirozi 21 Mass.App.Ct. 378, 383 (1986) (and cases cited therein): Fidler v. Eastman Kodak Co., 714 F.2d 192 (1st Cir. 1983).
Massachusetts courts adhere to the settled common law principle that a cause of action in tort accrues at the time the plaintiff is injured. Joseph A. Fortin Constr., Inc. v. Massachusetts Hous. Fin Agency, 392 Mass. 440, 442 (1984). See Dinsky v. Framingham, 386 Mass. 801, 803 (1982); White v. Peabody Construction Co., 386 Mass. 121, 129 (1982); Cannon v. Sears, Roebuck & Co., 374 Mass. 739, 741 (1978). The plaintiff in a tort action is injured when he or she suffers any cognizable injury; that the injuiy later becomes more pervasive or more permanent is irrelevant in determining when the cause of action accrues. For instance, in Town of Mansfield v. GAF Corp., 5 Mass.App.Ct. 551 (1977), the plaintiffwas barred from bringing an action to recover for damages resulting from a cracked, splitting and leaking roof. Even though the plaintiff did not learn that the damage was permanent and that the roof needed replacement until a period within the statute of limitations, the Court barred the action. “In this case there is no dispute that the plaintiff learned that the roof was defective no later than [five years before the action was filed]. The fact that it did not appreciate the extent of the damage until *432 later is immaterial.” Id. at 555 (citations omitted). See also, Olsen v. Bell Telephone Labs, Inc., 388 Mass. 171, 175 (1983) (tort cause of action accrues on date plaintiff discovers or reasonably should have discovered that he has been injured as a result of the defendant’s conduct, and not on the later date when the plaintiff discovers that the injury is permanent).
And while a plaintiffs cause of action does not accrue until his injury and its source is “reasonably discoverable,” if he is on notice of his injury, he is not excused from the obligation to undertake reasonable scientific investigation to determine its source, but is only excused if the source is “inherently unknowable.”
in White v. Peabody Construction Co., 386 Mass. 121 (1982), the plaintiffs moved into an apartment building and immediately began to notice “serious, widespread and continuing water leaks.” Id. at 123. The plaintiffs brought their action over three years later, seeking to avoid the statute of limitations bar by claiming that they “discovered” their injury only in the previous three-year period. The Court rejected this argument, stating:
[The plaintiffs manifest] ... a misunderstanding of the relationship between statutes of limitation, the “delayed discovery” doctrine, and the “discovery” devices authorized by our rules of civil procedure. In all cases the statute of limitations begins to run when the injured person has notice of the claim. The “notice” required is not notice of every fact which must eventually be proved in support of the claim. These details are properly the subject of requests for discovery once an action is filed. Rather, “notice” is simply knowledge that an injury has occurred.
In all of the delayed discovery cases cited above, the nature of the defendant’s wrong was such that the plaintiff did not discover and could not reasonably have discovered that the limitations period, measured from the date the injury actually occurred, had already expired. The plaintiffs here knew they were injured in 1975. They should reasonably have known that widespread water leaks in a newly constructed building are almost certainly the result of design or construction defects. The building was a public project and the identity of its designer and builder were matters of public record. There was, in short, nothing inherently unknowable about these causes of action.
Id. at 130 (citations omitted) (emphasis added).
The situation in Tagliente v. Himmer, 949 F.2d 1 (1st Cir. 1991), is also instructive. There, plaintiff alleged fraudulent misrepresentations which had been made relating to his purchase of land in Methuen, Massachusetts. The sellers had told him that the land was visible and accessible and had assured him that the extent of wetlands on the property would satisfy the open space requirements of the local zoning laws. The court concluded, however, that the statute of limitations was not tolled because, through the exercise of reasonable diligence, inspection and study the plaintiff could have learned about the land’s defects. The Court pointed out that plaintiff “had the right to have engineers or inspectors inspect the property ... and had the unrestricted opportunity to inspect the land, conduct surveys, secure topographical studies, and study the regulations governing use and conservation in Methuen.” Id., 5. In those circumstances, the court found that plaintiffs were surely on notice that there might be a regulation of wetlands by the government and that there was not “anything inherently unknowable about the land, or at the very least anything that the appellant could not have learned through reasonable diligence.” Id., 6. The Court concluded that the action had accrued no later than the date plaintiff had purchased the property, and was thus time-barred. See also Fidler v. Eastman Kodak, Co., 714 F.2d 192 (1st Cir. 1983), discussed at pp. 16-17, infra.
As to whether or not a jury could reasonably find that Cummings did not know, or should not have reasonably known, before April 21, 1985, that the defendants were a probable source of its injury, it is undisputed that as early as June of 1978, when Cummings was leasing space to approximately 300 businesses in the Woburn area, Mr. Cummings wrote to Woburn officials expressing his concern over possible contamination of the groundwater quality in Wo-burn. On May 21, 1979, moreover, the State Department of Environmental Qualify Engineering (“DEQE”) declared that public Wells G and H in Wo-burn were contaminated, and ordered them shut down indefinitely. Cummings’s properties were, and are, located in close proximity to, and some are actually contiguous to, Wells G and H (see map attached as Exhibit A).
Over the next few years, the closing of the wells and subsequent discovery of widespread contamination of the entire area was reported extensively in the local and national media. The defendants have included, as part of their record on these motions, literally hundreds of articles discussing the contamination of the Woburn area, some of which referred to a “diluted chemical soup” which flowed under Woburn. Indeed, in a letter to the Woburn City Council dated February 20, 1985, Mr. Cummings himself called Woburn a “chemical wasteland.”
In January of 1982, the Environmental Protection Agency (“EPA”) installed monitoring wells on Cummings’s properties and began sampling the groundwater and, on April 12, 1982, Mr. Cummings received an EPA report showing contamination on its properties. On December 21, 1982, Cummings’s properties were designated as part of a Superfund site. Numerous testing wells were drilled on Cummings’s properties from 1982 to April 6, 1985 and disclosed additional contamination. In 1983, the EPA concluded that both W.R. Grace and UniFirst had stored and *433 disposed of hazardous wastes on their properties, and ordered them to undertake an environmental investigation, which was reported in the Woburn Daily Times & Chronicle (UniFirst appendix, Ex. 43).
In the meantime, on May 14, 1982, a number of Woburn residents filed a much publicized suit against W.R. Grace’s subsidiary, Cryovac, Inc. and other companies in the Massachusetts Federal District Court, alleging that they had contaminated the town’s public water supply which had caused, inter alia, a number of Woburn residents to contract various illnesses, including leukemia.[6] In November 1984, W.R. Grace filed a third-party complaint against UniFirst in that action, which was reported in Woburn’s Daily Times & Chronicle on April 11, 1985 and again on April 15, 1985.
The Anderson suit attracted immediate and widespread media attention, and from that time on, almost every article specifically identified W.R. Grace as a potential (if not primary) source of contamination. Starting in May 1983, newspaper articles also identified UniFirst (then called Interstate Uniform Services) as an additional potential source of Woburn’s contamination. In all, more than 100 articles appeared in various newspapers identifying W.R. Grace and/or Interstate as potential sources of the contamination.
According to Mr. Cummings’s own deposition testimony, moreover, he was a regular reader of Woburn’s Daily Times & Chronicle and the Boston Globe, where the majority of the articles appeared. Additionally, Cummings admitted that, as a major land-owner and businessman in Woburn, he read the newspapers, inter alia, for business purposes.
Furthermore, defendants have produced a number of letters written by Mr. Cummings in which he acknowledged closely following the contamination controversy. Perhaps the most revealing of these letters is dated November 6, 1985 to the Internal Revenue Service, concerning the tax allocation of his salary for the preceding year, in which he wrote:
I have been very concerned and involved in researching problems of hazardous wastes which exist in close proximity to many WSCRT [W.S. Cummings Realty Trust] properties . . . [A]ll three Cummings Park buildings directly abut the controversial property of W.R. Grace Company ... In this regard, the Mass. DEQE and the EPA have already drilled more than forty deep water wells to test conditions in various WSCRT properties. Staying close to these investigations and keeping WSCRT’s properties out of any unnecessary limelight is of vital importance in preserving the buildings’ value.
The undisputed evidence outlined above thus indicates conclusively not only that Cummings should have known, but that he must have actually known, before the statute of limitations cut-off date, that W.R. Grace and UniFirst were potentially responsible for the contamination. Clearly, a fact reported in more than 100 articles in newspapers which he avidly read, was not “inherently undiscoverable." If Mr. Cummings was not actually aware by the cut-off date of W.R. Grace’s and Unifirst’s potential responsibility, he must have been virtually the only literate Woburn resident who remained so uninformed. In these circumstances, no reasonable juiy could conclude otherwise.
Plaintiff further argues, however, that a number of other companies were also identified as possible responsible parties, and that plaintiffs, even if aware of the contamination of their properties, were not on notice that defendants were the actual responsible parties until, at the earliest, 1986, when an EPA consultant first concluded that the defendants had been the principle generators of contamination, or, at the latest, 1989 when the EPA definitively named W.R. Grace and UniFirst as responsible parties. Not only is this argument factually unsupportable,[7] but it is legally irrelevant. The Supreme Judicial Court, as noted above, has held that once a plaintiff is aware that he has suffered an injury from a likely source, he is obligated to conduct further scientific inquiry as to the actual source of the harm. See Fidler v. Eastman Kodak Co., supra, 714 F.2d at 199, where the Court said:
We think that under Massachusetts law notice of likely cause is ordinarily enough to start the statute running. Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim. Thus on notice, his cause of action is no longer inherently unknowable.
See also: Bowen v. Eli Lilly & Co., supra, at 210. (“Reasonable notice that a particular product or a particular act of another person may have been a cause of harm to plaintiff creates a duty of inquiry and starts the running of the statute of limitations”) (emphasis added); Malapanis v. Shirazi, 21 Mass.App.Ct. at 386. (“We conclude that the plaintiff had been pointed toward the relationship between his harm and the [defendant’s] action to a degree sufficient to stimulate further inquiry. If it were otherwise, total understanding of the causal connection would be necessary to accrual of the cause of action and the limitations period would never run”).
Indeed, to carry defendants’ argument to its logical conclusion would require every case such as this to be tried and liability finally determined before a cause of action accrued. As stated in Fidler v. Eastman Kodak Co., supra, at 199:
Defining how much notice of cause is enough notice is inherently problematic where, as here, establishment of actual causation is itself an issue to be resolved at trial on the merits. If cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statute until cause, when *434 at issue, had been resolved at trial. [Citations omitted.) Such a definition would entirely defeat the statute of limitations in this class of cases, and we know of no court which has gone so far.
Rather, as stated in Bowen v. Eli Lilly & Co., supra, at 211 (where the plaintiff had reason to know that DES may have caused or contributed to her injuries but did not know who had manufactured the particular DES at issue) the identity of the exact manufacturer was held to be “a fact as to which the plaintiff had a duty of inquiry based on the information concerning causation that she had.”
Based upon the undisputed facts here, the Court concludes that plaintiff knew or should have known prior to April 21, 1985, as a matter of law, that the defendants were likely sources of any injuiy, at least to its contaminated properties, and that its action with respect to at least such properties is accordingly time-barred.
With respect to plaintiffs’ uncontaminated properties (see footnote 2, supra), the Supreme Judicial Court, in Gannett Corp. v. Boston Edison Co., 415 Mass. 303, 305 (1993), has held that recovery of “economic” damages of the type which plaintiffs allege in their “memorandum in opposition,” are barred where, as here, there is an admitted absence of any evidence of physical damage to or invasion of a plaintiffs properly. Should such contamination be discovered on such properties at some later date, it can be decided in a subsequent legal action whether plaintiffs should reasonably have discovered such contamination more than three years before the filing of such subsequent action.
COUNTERCLAIMS
Plaintiffs have moved for summary judgment with respect to W.R. Grace’s and UniFirst’s counterclaims which seek to avoid defendants’ clean-up obligations pursuant to a number of written agreements relating to responsibility for the costs of investigation, removal and/or remediation of the contamination on the grounds that the agreements were induced by Cummings’s fraud and misrepresentation (UniFirst Counts I-IV; W.R. Grace Count I) or resulted from unilateral mistake of fact (UniFirst Count VII) or mutual mistake of fact (UniFirst Count VIII; W.R. Grace Count V) and with respect to defendants’ counterclaims which seek recovery of damages for violation of G.L.c. 93A (UniFirst Count V; W.R. Grace Count III); unjust enrichment and restitution (UniFirst Count VI; W.R. Grace Count IQ; contribution pursuant to G.L.c. 23 IB (UniFirst Count X; W.R. Grace Count VI); compensation pursuant to G.L.c. 2 IE, §§4, 5 (UniFirst Count IX; W.R. Grace Count IV); and which seek a declaratory judgment pursuant to G.L.c. 231A (Uni-First Count XI; W.R. Grace Count VII).
Despite the disparate numbering of the claims, the defendants’ counterclaims are, in their essentials, identical, and are discussed seriatim below.
Fraud and Misrepresentation Counterclaims (UniFirst Counts I-IV, W.R. Grace Count Q
Before the filing of Cummings’s lawsuit, UniFirst and W.R. Grace had entered into a total of five different written agreements in 1990-1991 respecting the contamination at the Superfund site: an Indemnification Agreement, a Response Cost Agreement, two letter agreements (essentially identical, one with W.R. Grace and one with UniFirst), and a Consent Decree. Defendants, by their counterclaims, now seek to void these agreements on the grounds that they were induced by fraud or were the result of unilateral or mutual mistake.
To prevail in their attempt to void the agreements for fraud and misrepresentation, the defendants must prove that the plaintiffs: (1) made misrepresentations of a material fact, (2) that they knew, or should have known, to be false, (3) which were made to induce the defendants to act thereon, (4) that the defendants did, indeed, act thereon, (5) in reasonable reliance that the statements were true. Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982); Snyder v. Sperry & Hutchinson Co., 368 Mass. 433, 444 (1975); Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77 (1991).
“[A) party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Rule 56(c) further provides that “summary judgment, when appropriate, may be rendered against the moving party.”
Assuming, for the sake of argument, that the alleged misrepresentations were made, the court must determine, as a matter of law, whether a jury could reasonably conclude that defendants reasonably relied on the alleged misrepresentations.
The defendants argue, as a threshold matter, that the reasonableness of their reliance is a state-of-mind factual issue not suitable to determination at the summary judgment stage. This argument, however, is unavailing, for much the same reasons as was plaintiffs somewhat similar argument with regard to the statute of limitations defense, discussed supra. This is because on the undisputed facts here, no jury could reasonably conclude that defendants reasonably relied on the alleged misstatements. The alleged misrepresentations (the substance of which are specified, infra) consisted entirely of disclaimers of responsibility for contamination of a type invariably asserted by a potentially responsible party in order to preserve its legal defenses. Indeed, the undisputed documents are replete with similar disclaimers repeatedly asserted by W.R. Grace and UniFirst from the early 1980s until almost the present time. It strains credulity for defendants, who are sophisticated businessmen and were undertaking their own comprehensive *435 environmental site investigations, and who were (and are) represented by able and experienced environmental counsel, to contend that they were induced to enter into the challenged cleanup agreements by such routine disclaimers.
Secondly, it is clear beyond dispute that defendants did not, as a matter of law, rely on any such disclaimers. In the first place, in each and every one of these agreements, which were entered into after the alleged misrepresentations occurred, the parties specifically contemplated and addressed the contingency that Cummings would later be found to have contributed to the contamination. Each of these documents provided for and/or waived an escape for W.R. Grace and for UniFirst from their contractual clean-up responsibilities in the event it were later determined that Cummings had caused contamination.
Thus the 1990 Indemnification Agreement provided that the defendants would indemnify Cummings against potential lawsuits by third parties seeking damages for environmental contamination, but also provided:
Covered Matters shall mean groundwater contamination at or emanating from the Cummings Properties and any resulting soil contamination; provided, however, that any groundwater contamination claimed or alleged to be at or originating from the Cummings Properties, and any resulting soil contamination, shall not be within Covered Matters if Grace and UniFirst shall sustain the burden of proving . . . that such groundwater contamination did not emanate from the Grace Facility and/or the UniFirst Facility.
Similarly, the 1990 Response Cost Agreement provided that W.R. Grace and UniFirst would reimburse Cummings for certain clean up costs which might be incurred by Cummings, but also specifically provided:
Covered Matters shall mean groundwater contamination at or emanating from the Cummings Properties and any resulting soil contamination; provided, however, that such groundwater contamination and resulting soil contamination shall not be within Covered Matters if Grace and UniFirst shall sustain the burden of proving that such groundwater contamination originated at the Cummings Properties.
Both 1991 letter agreements, in which W.R. Grace and UniFirst agreed, inter alia, to pay all of the costs associated with the Remedial Investigation/Feasibility Study (“RI/FS”) required by the consent decree, provided that:
[A]ny damages . . . sought to be recovered from any of the Cummings Parties with respect to that portion of the work related to the RI/FS for the Central Area shall be deemed to be “Covered Damages” for purposes of the Indemnification Agreement. . . and such damages shall be deemed to have resulted from “Covered Matters” for the purposes of the Indemnification Agreement even if the groundwater contamination originated at the Cummings Properties and/or did not emanate from the Grace Facility and/or the UniFirst Facility, notwithstanding anything to the contrary in . . . the Indemnification Agreement.
The letter agreements also provided that:
[A]ny response costs incurred by the Cummings Parties . . . with respect to that portion of the Work related to the RI/FS for the Central Area shall be deemed to be future response costs incurred with respect to “Covered Matters” for purposes of the Response Cost Agreement; and such response costs shall be deemed to have been incurred with respect to “Covered Matters” for purposes of the Response Cost Agreement even if the groundwater contamination and any resulting soil contamination originated at the Cummings Properties . . .
Finally, the 1991 consent decree, entered into by all of the parties to this litigation, provided that:
Without limiting the scope of the foregoing, each Settling Defendant expressly reserves and retains its rights to assert any claims or causes of action against any other Settling Defendant. . .
The express provisions in the Indemnification Agreement, Response Cost Agreement and letter agreements evidence, as a matter of law, the clear intent of the parties that certain costs would be borne by W.R. Grace and UniFirst, but that if the defendants, at a later time, could prove that Cummings was responsible for the contamination which gave rise to these costs, the defendants would not be so obligated. It simply defies logic for W.R. Grace and UniFirst to assert that they accepted at face value and relied to their detriment on Cummings’s disclaimers of responsibility in entering into these agreements, while at the same time crafting specific provisions which specifically contemplated and made provision for the opposite contingency.
In these circumstances, no reasonable fact finder could conclude that defendants were induced by plaintiffs’ disclaimers to enter into the agreements. Summary judgment for the plaintiffs on these counts is therefore appropriate.
Mutual and Unilateral Mistake of Fact Counterclaims (UniFirst Counts Vil and VIII, W.R. Grace Count V)
Based on the same facts, defendants argue that the various agreements should be rescinded because of mutual or unilateral mistake of fact.[8] An action for mutual mistake of fact will lie:
Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the con *436 tract is voidable by the adversely affected parly unless he bears the risk of mistake . . .
Maloney v. Sargisson, 18 Mass.App.Ct. 341, 345 (1984) (citing Restatement (Second) of Contracts § 152(1979)). The Maloney court further noted that: “[a] party bears the risk of mistake where the risk is allocated to him by agreement of the parties.” Id. at 346 (citing § 154(a) of Restatement (Second) of Contracts (1979)).
Here, it is clear not only that any “mistake” had no “material effect on the agreed exchange of performances” (since the agreements provided therefor) but the agreements provided for the defendants to “bear the risk of mistake.”
G.L.c. 93A Counterclaims (UniFirst Count V; W.R. Grace Count III)
Defendants argue that even should the court find, as it has, that their fraud and misrepresentation claims cannot survive summary judgment, their c. 93A claims should survive because they do not require a showing of reasonable reliance, but only that plaintiffs had used unfair or deceptive business practices.
However, G.L.c. 93A requires that “the objectionable conduct. . . attain a level of rascality ihat would raise an eyebrow of someone inured to the rough and tumble world of commerce.” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). In the present case, the alleged “unfair and deceptive” practices consisted solely of Cummings’s disclaimers that it had contaminated its own property. Specifically, the defendants contend that Cummings’s denial of responsibility contained in a response to an EPA letter naming plaintiff as a potentially responsible party (“PRP”) contained the following “misrepresentation”:
[T]he alleged presence of hazardous substances, if any, at plaintiffs’ properties is the result of actions of third parties over whom CPMI [Cummings Property Management, Inc.) had no control and with whom CPMI had no contractual relationship. Further, CPMI was in no position to know of, or prevent the introduction of, such hazardous substances into the environment.[9]
The quoted language, however, essentially tracks one of the defenses available to PRPs as outlined in 42 U.S.C. §9607(b)(3), and it is common practice for a party accused of being a PRP to respond with a litany of available legal defenses. Indeed, each of the defendants has engaged in similar repeated protestations of non-liability from the time they were first accused of causing the contamination in the early 1980s, to the present time. While these statements may have been, in a literal sense, “deceptive,” they clearly do not rise to the requisite level of “rascality” which could raise anyone’s eyebrows, in the circumstances.
Defendants’ c. 93A claims must also fail because they cannot, as a matter of law, have resulted in any damages resulting from the alleged “deceptive” acts. This is because the defendants clearly did not rely on the alleged misrepresentations, but specifically provided for the contingency that Cummings might turn out to have been a responsible party.
Contribution Under G.L.c. 23IB Counterclaims (UniFirst Count X; W.R. Grace Count VI)
Defendants’ counterclaims also seek contribution from the plaintiffs for any damages that the plaintiffs might recover from defendants in this action. As this Court has allowed defendants' motion for summary judgment, however, these counts are now moot and summary judgment for the plaintiffs is appropriate.
G.L.c. 2IE, §§4, 5 Counterclaims (UniFirst Count IX; W.R. Grace Count IV)
Finally, defendants’ counterclaims seek recovery under c. 21E, §4, which provides:
Any person who undertakes assessment, containment, or removal action regarding the release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release iur the reasonable costs of such assessment, containment and removal.
Plaintiffs do not dispute that the defendants could recover from plaintiffs pursuant to c. 2 IE if plaintiffs caused a release which damaged defendants, but argue that they are indemnified from any liability under c. 2 IE by the terms of the clean-up agreements. The agreements, however, provide for no such blanket indemnification.
Except for reimbursement of costs for the Remedial Investigation-Feasibility Study (“RI/FS”) in the Central Area,[10] these agreements specifically provide that Cummings is not to be indemnified if W.R. Grace and UniFirst can sustain the burden of proving that W.R. Grace and UniFirst were not responsible for contaminating Cummings’s property (under the Indemnification Agreement) or that Cummings was responsible for contaminating its own property (under the Response Costs Agreement). Nor do the agreements prohibit defendants from recovering damages from plaintiffs resulting from contamination of defendants’ own properties, if defendants can prove such contamination was caused by plaintiffs.
There remain, then, disputed factual issues regarding defendants’ c. 2 IE causes of action which are not foreclosed by the agreements, except as regards the RI/FS costs in the Central Area.
Accordingly, summary judgment will be denied to plaintiffs on defendants c. 2IE counterclaims except insofar as they seek reimbursement for Remedial Investigation-Feasibility Study costs (“RI/FS”) for the Central Area.
*437 Unjust Enrichment and Restitution Counterclaims (UniFirst Count VI; W.R. Grace Count II)
For the same reason, defendants' unjust enrichment counterclaims survive summary judgment. To the extent that defendants may have already reimbursed the plaintiffs for past response costs (other than for those associated with the RI/FS) arising out of contamination caused by Cummings, they were not obligated to do so, and would be entitled to a refund thereof in order to prevent unjust enrichment of the plaintiffs.
Declaratory Judgment Counterclaims (UniFirst Count XI; W.R. Grace Count VII)
To the extent the defendants seek a declaratory judgment inconsistent with the Court’s rulings herein, summaryjudgment is entered for the plaintiffs. To the extent defendants seek a declaratory judgment consistent with the Court’s rulings herein, summaryjudgment is granted to the defendants.
ORDER
For the reasons outlined above, the defendants’ motion for summary judgment is ALLOWED with respect to all of the counts of the complaint.
Plaintiffs’ motion for summary judgment on UniFirst’s counterclaims is ALLOWED with respect to Counts I througn IV (fraud and misrepresentation), V (c. 93A), VII and VIII (unilateral or mutual mistake), X (contribution) and XI (except to the extent defendants seek a declaratory judgment consistent with this Order). Plaintiffs’ motion for summary judgment on UniFirst’s counterclaim is DENIED with respect to Counts VI (unjust enrichment) and IX (c. 2 IE) except to the extent that those counts seek damages relating to the RI/FS for the Central Area, as to which the motion is ALLOWED.
Plaintiffs’ motion for summary judgment on W.R. Grace’s counterclaims is ALLOWED with respect to Counts I (fraud and misrepresentation), III (G.L.c. 93A), V (mistake), VI (contribution), and VII (except to the extent a declaratory judgment is sought consistent with this Order). Plaintiffs’ motion for summaryjudgment on W.R. Grace’s counterclaim is DENIED with respect to Counts II (unjust enrichment) and IV (c. 21E) except to the extent that those counts seek damages relating to the RI/FS for the Central Area, as to which the motion is ALLOWED.

The properties which are known to be contaminated are those located at 21 Olympia Avenue and at 200 West Cummings Park, in Woburn, and there is disputed evidence of contamination at 600 West Cummings Park and 74-124 Cummings Park. They are referred to hereinafter as “the contaminated properties.” The remaining properties, it is agreed, have not, at the present time, been found to be contaminated (see plaintiffs’ memorandum in opposition to summaryjudgment, p. 48) and are referred to hereinafter as “the uncontaminated properties.”

 It is undisputed that the limitations period applicable to all counts of the complaint is three years. See: G.L.c. 260, §2A (tort actions); Oliveira v. Pereira, 414 Mass. 66, 73 (1992) (G.L.c. 21E).

Although, in Hartong, this Court concluded that, in view of the prior contrary rulings of the Superior Court, summary judgment should not be allowed on such basis until the appellate courts of the Commonwealth had addressed the issue, another judge of this court has now adopted the same reasoning in granting summaryjudgment. See, Kelley, et al. v. Texaco Inc., et al., Suffolk Superior Court No. 91-6917-B, 91-6918-B and 92-0390-B, Botsford, J. (Lawyers Weekly No. 12-249-93). Accordingly, I no longer feel constrained by the prior contrary rulings of the Superior Court.

“[O]nce the defendant pleads the statute of limitations as a defense . . . and establishes that the action was brought more than three years from the date of the injury, the burden of proving facts that take the case outside the impact of the statute falls to the plaintiff.” Riley v. Presnell, 409 Mass. 239, 243-44 (1991) (citing Franklin v. Albert, 381 Mass. 611, 619 (1980)). See also Pederson v. Time, Inc., 404 Mass. 14, 17, n.8 (1989); Teller v. Schepens, 381 Mass. 621, 623 (1980); Friedman v. Jablonski, 371 Mass. 482, 487 (1976).

 Anderson, et al. v. Cryovac, Inc., et al v. UniFirst Corp., (C.A. No. 82-1672-S).

Not only had W.R. Grace and Unifirst been identified as potentially responsible parties as early as 1982-1983 in the publicity surrounding the Anderson suit, but in a report dated March 8, 1982, the EPA’s consultants concluded that “the contaminants influencing Wells G & H are likely coming from an area north and/or northwest of the wells.” The report further concluded that the contamination was probably being carried by an underground plume within the study area, and a map of the study area (included in that report) identified W.R. Grace and UniFirst as being north of the wells and within the study area. Even if it is not established that Mr. Cummings received this particular report, it is clear that all the EPA test results were available to plaintiffs. Having been put on notice of injury to its property, and of its likely sources (see, e.g., UniFirst appendix, Ex. 43) Cummings was free to request information from the EPA, to file an FOIA request to the EPA, and/or to conduct its own environmental investigation (which it consciously chose not to do).

Only UniFirst has alleged unilateral mistake of fact.

 Defendants contend that Cummings also repeated similar disclaimers in numerous meetings with the EPA and with the defendants.

 With respect to RI/FS costs for the Central Area, the letter agreement provides that Cummings is entitled to indemnification pursuant to the Indemnification Agreement and to reimbursement, pursuant to the Response Cost Agreement, “ even if the groundwater contamination and any resulting soil contamination originated at the Cummings Properties and/or did not emanate from the W.R Grace Facility and/or the UniFirst Facility, notwithstanding anything to the contrary ... [in the Indemnification or Response Cost Agreements].”