**Deborah FIDLER, Plaintiff, Appellant,**

v.

**EASTMAN KODAK COMPANY, Defendant, Appellee.**

No. 83-1052.

United States Court of Appeals, First Circuit.

Argued June 7, 1983.

Decided Aug. 3, 1983.

---

Gary Buseck, Boston, Mass., with whom Cynthia J. Cohen, Charles M. Crowley, Jr., and Parker, Coulter, Daley & White, Boston, Mass., were on brief, for plaintiff, appellant.

Susan J. Baronoff, Boston, Mass., with whom Roche, Carens & DeGiacomo, Boston, Mass., was on brief, for defendant, appellee.

Before COFFIN and BREYER, Circuit Judges, and MURRAY,* Senior District Judge.

COFFIN, Circuit Judge.

Plaintiff/appellant Deborah Fidler brought this products liability suit against defendant/appellee Eastman Kodak Company on September 23, 1981 in Massachusetts Superior Court. Appellee subsequently removed the action to federal district court and, in March of 1982, moved for summary judgment on three grounds. After a hearing in September of 1982 limited to the issue of whether the suit was barred by the statute of limitations, the district court on December 17, 1982, 555 F.Supp. 87, granted summary judgment for appellee. We affirm.

Because application of Massachusetts' discovery rule requires a careful analysis of the factual record, and because summary judgment is inappropriate if any genuine issue of material fact remains, Fed.R.Civ.P. 56(c), we review the relevant history of this case in some detail. In October of 1973 appellant, complaining of back and leg pain, was treated at a Boston hospital. When bed rest did not help, the treating physician, suspecting a ruptured disc, ordered a myelo-

* Of the District of Massachusetts, sitting by designation.

gram[1] to evaluate appellant's back problem. The myelogram was done with a contrast medium known as Pantopaque. The results of the myelogram were within normal limits.

Appellant's pain persisted and after further examination at the first hospital and at a clinic,[2] she was admitted to another hospital for a second, more complete myelogram.[3] The results of the second myelogram were also normal. After the second myelogram, appellant developed a severe headache which lasted several days. She was told by doctors that it was a normal reaction to the myelogram.

In June of 1976 appellant, suffering "crushing" facial and head pains, went to a hospital emergency room where she was seen by a Dr. Butler. Dr. Butler's examination revealed no abnormalities, and his diagnosis was "atypical facial pain", meaning that no cause for the pain had been established.

Appellant continued under Dr. Butler's care and, in September of 1977, Dr. Butler decided to do a cervical myelogram, or clivogram, primarily to look for a tumor or aneurism, but also to look for evidence of multiple sclerosis or of a reaction to the Pantopaque contrast medium from a previous myelogram. As a result of the clivogram, Dr. Butler concluded that the cause of appellant's pain was not "mechanically definable" and that, among possible causes, the presence of Pantopaque in appellant's brain stem had "dropped down" as a possibility. Despite Dr. Butler's consideration of Pantopaque as a possible cause of appellant's condition, he did not discuss that possibility with appellant at that time.

A CAT scan performed while appellant was still hospitalized after the clivogram showed no abnormalities, but the radiologist made an "[i]ncidental note . . . of multiple Pantopague droplets in the subarachnoid space from previous myelogram." This was not called to appellant's attention. As after the second myelogram, appellant suffered severe headache pains following this third myelogram.

An EEG performed in July of 1978, after appellant had had a seizure at work, showed abnormalities consistent with seizure activity. Concerned that appellant might have a brain tumor, Dr. Butler hospitalized her for further testing. A CAT scan performed on September 6, 1978 showed no abnormalities, but again note was made of "a few drops of high density in the basal cisterns due to previous injected Pantopaque". The results of a cerebral arteriogram performed on September 7, 1978 were also normal.

On the evening of September 7, Dr. Butler visited appellant's hospital room. He told her that they had found no tumor, but suggested that her problems were caused by Pantopaque remaining in her spinal column from myelograms. In a deposition preparatory to trial of this case, appellant gave the following testimony describing her conversation with Dr. Butler that evening:

> "Dr. Butler told me, the night after— the night of my arteriogram, he came to my bedside and he told me that they were looking for a brain tumor. And he said, 'We didn't find any tumor, but what we found,' he said, 'is we found some Pantopaque that was left in your spine from a previous Myelogram.' And he said it was wedged in Meckel's cavity, and it was more or less surrounded by scar tissue, and causing inflammation . . . .
>
> "He said that they were looking for a tumor in a certain portion, and he, you know, had told me before where it was,

---

1. A myelogram is an X-ray visualization or photograph of the spinal cord after the injection of a contrast medium into the spine. As the contrast medium flows, first toward the patients head and then back again, it forms a column which can be scanned by X-ray. Deviations, obstructions or deformities in the column suggest to a physician the locus of a patient's difficulties, thus aiding in diagnosis and treatment.

2. A report at the clinic noted "droplets of residual myelographic contrast material in the neurocanal," but no one at the clinic mentioned that to appellant.

3. The appellant's first myelogram had focussed only on the lumbar region.

down in here. And he said, 'We didn't find—there were no tumors,' he said, 'but what we think was causing all your problems was,' he said, 'we found like a glob of Pantopaque,' he said, 'that would be left over from one of your myelograms. And it has wedged itself into someplace called Meckel's cavity, and it is close to some nerve endings, and it is causing some scar tissue.'"

A few weeks later, when appellant visited Dr. Butler at his office, he "again explained about the Pantopaque being embedded in Mecal's Cave, and ... said that it was probably surrounded by scar tissue which if disturbed would cause more scar tissue" and told appellant that she "would just have to learn to live with it".

In January of 1979 appellant consulted with an attorney, who advised her that she had no case against the doctors or the hospitals who had performed the myelograms. Shortly thereafter, she visited Dr. Butler and asked him if she had a claim against anyone. He replied no, that "there is always some [Pantopaque] left after a myelogram and there are thousands of people walking around with it in their bodies with no complaints". He also indicated that he was "not sure" that appellant's head pain was caused by Pantopaque.

During 1979 appellant consulted with three other attorneys, at least one of whom met with Dr. Butler. Each of them indicated that she had no case unless she could find a doctor who would say that her head pain was due to the Pantopaque. In November of 1979 Dr. Butler referred appellant to a Dr. Wepsic at Massachusetts General Hospital "for evaluation to see if he [felt] that the Pantopaque ... [was] responsible for the facial pains that she [was] having and as to whether a nerve block or surgical procedure would be of any advantage". Dr. Wepsic told appellant that there was a possibility that the Pantopaque was causing her head pain and problems but that surgery was not recommended. Dr. Wepsic reported to Dr. Butler that he was "at a loss to explain the cause of [appellant's] pain and would be reluctant to as-

cribe all of her complaints to Pantopaque in the intercranial cavity".

Appellant's pain abated during most of 1980, while she was pregnant, but returned thereafter, and in October of 1980 she began to have severe pains in her eyes. In December of 1980 she retained her present attorney. That attorney contacted Dr. Butler, who responded with a summary of his treatment of appellant over the years and a letter describing his treatment and diagnosis. He concluded in that letter:

"I, with Dr. Wepsic and Dr. Smith, have failed to find any definitive cause for the pain.

"There was some question of potential reaction to the contrast from myelogram performed in 1972 [sic] for a possible ruptured disc. However, with no abnormalities seen on the clivogram performed at the Emerson Hospital in 1976 [sic], it is difficult to say or postulate that there is a cyst or arachnoid reaction. The normal spinal fluid obtained in 1977 would indicate that no chemical reactions were present at the time of that clivogram. "At the present time she still carries a diagnosis of atypical facial pain and the etiology of this is uncertain."

In mid-1981 appellant saw a Dr. Kott, who, having reviewed two CAT scans, told plaintiff that there was a "possibility" that Pantopaque was the cause of her problems but that he was "unable to establish any definite relationship between the Pantopaque and her pain syndrome". After consulting with a neuroradiologist, Dr. Kott wrote to appellant that the neuroradiologist "had seen some cases where Pantopaque has produced various pain syndromes, but of course it is very hard to be sure whether there is a cause [and] effect relationship".

On September 23, 1981 appellant filed suit in this case. She indicated on appeal that it was only after the commencement of the lawsuit that she was able to establish through consultation with a Dr. Margolis that Pantopaque is the cause of her injuries. It is upon the testimony of Dr. Margolis that appellant intends to rely if allowed to go to trial.

■ Appellant's complaint alleged two causes of action, one based on appellee's negligent failure to give adequate warning and instructions accompanying the Pantopaque contrast medium, and one based on appellee's breach of express and implied warranties that the contrast medium was safe and merchantable for the purpose for which it was to be used.[4] The district court found and the parties agree that the statute of limitations on the negligence claim is established by Mass.G.L. c. 260, § 2A, which provides "actions of tort . . . shall be commenced only within three years next after the cause of action occurs", and that that for the breach of warranty action is established by Mass.G.L. c. 106, § 2–318, which provides that "[a]ll actions under this section shall be commenced within three years next after the date the injury and damage occurs".

The crucial question is when the two three-year limitations statutes began to run. Based on the Massachusetts Supreme Judicial Court's decisions in analogous areas of tort law,[5] the district court assumed that the Supreme Judicial Court, if confronted with the question, would apply a discovery rule in products liability cases under which the cause of action does not accrue until the plaintiff learns or reasonably should have learned that he has been injured by the defendant's conduct. That assumption was confirmed by the Supreme Judicial Court's subsequent decision in *Olsen v. Bell Telephone Laboratories, Inc.,* 388 Mass. 171, 445 N.E.2d 609, 610 (1983). The plaintiff there sued the supplier of an industrial chemical; plaintiff's exposure to the chemical in the course of his employment had allegedly caused his asthma. The court held:

"We have not previously decided when a cause of action for negligence resulting in an insidious occupational disease accrues under G.L. c. 260, § 2A . . . . In [cases in analogous areas of tort law adopting a discovery rule] the court has been guided by the principle that a plaintiff should be put on notice before his or her claim is barred by the passage of time. Thus the discovery rule has been applied to causes of action based on 'inherently unknowable' wrongs. There is no sound reason why the same accrual rule should not apply to actions to recover damages for an insidious disease caused by negligence. We conclude, therefore, that Olsen's cause of action did not accrue before he knew or should reasonably have known that he had contracted asthma as a result of conduct of the defendants." 445 N.E.2d at 611–12.

Though appellant's products liability claim arises in the context of medical treatment rather than occupational disease, we are confident that the Supreme Judicial Court would apply the same discovery rule, at least to the negligence claim.

A separate question, however, concerns the breach of warranty claim. Though the plaintiffs in *Olsen* alleged both negligence and breach of warranty, they did not appeal the lower court's holding that the statute had run on the warranty claim. The Supreme Judicial Court therefore did not address that issue or indicate whether the discovery rule also applies to products liability claims when brought under a warranty theory. *Id.* 445 N.E.2d at 610. The court has indicated on other occasions, however, that whenever possible "limitation statutes should apply equally to similar facts regardless of the form of proceeding". *Hendrick-*

---

4. Defendant/appellee does not manufacture or sell Pantopaque. It does manufacture a chemical called ethyl 10 iodophenylundecanoate, which is sold to other companies who sterilize, repackage and sell it as Pantopaque contrast medium. In moving for summary judgment, appellee contended not only that this action was barred by the statute of limitations, but also that appellee was not liable because it does not manufacture or sell Pantopaque contrast medium and because Pantopaque was not the cause of appellant's injuries. Those issues

were not reached by the district court and are not before us.

5. *Franklin v. Albert,* 381 Mass. 611, 411 N.E.2d 458 (1980) (applying discovery rule to medical malpractice claim); *Friedman v. Jablonski,* 371 Mass. 482, 358 N.E.2d 482 (1976) (applying discovery rule to deceit in the sale of real estate); *Henderickson v. Sears,* 365 Mass. 83, 310 N.E.2d 131 (1974) (applying discovery rule to attorney's negligent certification of title).

son v. *Sears*, 365 Mass. 83, 85, 310 N.E.2d 131 (1974); *accord Cannon v. Sears, Roebuck & Co.*, 374 Mass. 739, 743, 374 N.E.2d 582 (1978) (applying measure of accrual of cause of action in products liability negligence cases to parallel accrual in breach of warranty cases). We therefore conclude that the Supreme Judicial Court would apply the discovery rule to a products liability action whether brought under a negligence theory or a breach of warranty theory.

Appellant argues, however, that a variant of the discovery rule should be applied to breach of warranty claims because of the different statutory language—"after the date the injury and damage occurs" versus "after the cause of action occurs". The words "and damages" were added in a 1974 amendment to the statute which extended the statutory period from two to three years. Appellant points to one Massachusetts appeals court decision which interpreted that addition "as extending the limitations period from the time when the injury is first perceived to the time when the damage flowing from the injury can be fairly estimated". *Cameo Curtains, Inc. v. Philip Carey Corp.*, 11 Mass.App. 423, 416 N.E.2d 995, 997 (1981). She argues that because she was experiencing new and severe pain symptoms as late as October of 1980, her cause of action for breach of warranty did not accrue until then.

In *Olsen* the Supreme Judicial Court specifically rejected plaintiff's similar argument, under the negligence statute, that his cause of action did not accrue until he knew that this condition was permanent.

"Adoption of Olsen's argument that a claim for permanent injury accrues only when the permanency is, or should have been discovered, would create an unacceptable imbalance between affording plaintiffs a remedy and providing defendants the repose that is essential to stability in human affairs. If knowledge of the extent of injury were to control the accrual of a cause of action, the fixed time period of statutes of limitations effectively would be destroyed. The full extent of an injury often is not discoverable for many years after it has been incurred. Under the rule proposed by Olsen, there seldom would be a prescribed and predictable period of time after which a claim would be barred." 445 N.E.2d at 612.

We think that the court would apply similar reasoning under the breach of warranty statute and would not interpret it to create a different time of accrual than that for the companion negligence claim. *See Cannon, supra; Hendrickson, supra.*

Furthermore, the words "damage occurs" do not in themselves suggest that the full extent of the injury must be known before a cause of action accrues. Their more likely significance is to set the time for accrual when actual damage results from a breach rather than at the time of the breach itself. *Cf. Hoffman v. Howmedica, Inc.*, 373 Mass. 32, 36, 364 N.E.2d 1215 (1977) (elimination of privity requirement in the breach of warranty statute had "evident purpose [of] "deemphasizing the 'sale' transaction and [looking] instead to the harm which may result from" defective products). A discovery rule—requiring cognizance of both the injury and its cause—necessarily sets the date of accrual at the later of the times when breach and damage are discovered. We therefore conclude that the Massachusetts discovery rule should be applied in the same way to appellant's negligence and breach of warranty claims.

Applying the discovery rule to the case at bar, the district court held that appellant knew or had reason to know of a casual relationship between her injuries and the conduct of the defendant no later than September 7, 1978—the first day on which Dr. Butler indicated to appellant that he thought a residuum of Pantopaque in her spine from myelograms was the cause of her symptoms. The court therefore held that appellant's claim, filed on September 23, 1981, was barred by the three-year statutes of limitations.

Summary judgment is appropriate only if "there is no genuine issue as to any material fact," Fed.R.Civ.P. 56(c), and the court must look at the record in the light most favorable to the party opposing the motion,

indulging all inferences in that party's favor. *See, e.g., Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975). "Functionally the theory underlying a motion for summary judgment is essentially the same as the theory underlying a motion for directed verdict. The crux of both theories is that there is no genuine issue of material fact to be determined by the trier of the fact, and that on the law applicable to the established facts, the movant is entitled to judgment." 6 Moore's Federal Practice ¶ 56.02[10], at 56–43. This is especially true where, as here, there has been a hearing on the summary judgment issue and a full development of relevant facts through deposition testimony. There is no dispute between the parties as to the essential evidentiary facts—what appellant was told at various times about her injuries and their cause—but only as to the ultimate conclusions to be drawn from those facts. But even such conclusions should be left to the trier of fact "in all but the most exceptional cases" in which the evidence permits only one conclusion. *Grigsby v. Sterling Drug, Inc.,* 428 F.Supp. 242, 243 (D.D.C.1975).

In applying a discovery rule to "causes of action based on 'inherently unknowable' wrongs", the Supreme Judicial Court "has been guided by the principle that a plaintiff should be put on notice before his or her claim is barred by the passage of time". *Olsen, supra,* 445 N.E.2d at 610–11; *see also Franklin v. Albert,* 381 Mass. 611, 618–19, 411 N.E.2d 458 (1980). Such notice includes not only knowledge that one has been injured but knowledge of its cause—that plaintiff "has been harmed as a result of the defendant's conduct". 445 N.E.2d at 611.

Defining how much notice of cause is enough notice is inherently problematic where, as here, establishment of actual causation is itself an issue to be resolved at trial on the merits. If cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statute until cause, when at issue, had been resolved at trial. *See Dawson v. Eli Lilly and Co.,* 543 F.Supp. 1330, 1334 (D.D.C.1982). Such a definition would entirely defeat the purposes of a statute of limitations in this class of cases, and we know of no court which has gone so far. A number of courts have, however, adopted discovery rules under which a cause of action does not accrue until the plaintiff discovers or in the exercise of due diligence should discover, in addition to his injury and its cause, that the injury has resulted from some negligence or wrongdoing on the part of the defendant, some actionable wrong. *See Dawson v. Eli Lilly and Co., supra* (applying D.C. law); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 575 (3d Cir.1976) (applying New Jersey law); *Anderson v. Shook,* 333 N.W.2d 708 (N.D.1983); *Hoffman v. Rockey,* 55 Or.App. 658, 639 P.2d 1284, 1286 (1982); *Jacoby v. Kaiser Foundation Hospital,* 1 Haw.App. 519, 622 P.2d 613 (1981); *Foil v. Ballinger,* 601 P.2d 144, 147 (Utah 1979); *Brown v. Mary Hitchcock Memorial Hospital,* 117 N.H. 739, 378 A.2d 1138 (1977); *Owens v. Brochner,* 172 Colo. 525, 474 P.2d 603 (Colo. 1970). Several federal courts of appeals had adopted a similar discovery rule in medical malpractice cases under the Federal Tort Claims Act, delaying the running of the statute until the patient "had a reasonable opportunity to discover each of the elements of a cause of action—duty, breach, causation, and damages," until that approach was overruled in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). *Stoleson v. United States,* 629 F.2d 1265, 1268 n. 3 (7th Cir. 1980).

Under this legal standard, notice of breach of duty on the part of appellee would have to be reasonably attributable to appellant by September 23, 1978, three years before suit, for the statute of limitations to bar her claim. As of that date appellant could be said to have learned two things: first, the causal relationship, that her head and facial pain may have resulted from Pantopaque contrast medium remaining in her spinal column from previously performed myelograms; second, the possible mechanics of causation, in Dr. Butler's words, "a glob of Pantopaque has wedged itself into someplace called Meckel's cavity,

and it is close to some nerve endings, and it is causing some scar tissue". On that basis, she could also have inferred the possibility that someone was at fault; she, in fact, within a relatively short period of time and without additional information, sought legal counsel to explore that possibility. But a fact finder could well conclude, indeed, might have to conclude, that she did not know and had no duty to know on September 23, 1978 that appellee's negligent conduct was responsible for the Pantopaque remaining in her system.

■ But we find no indication in Massachusetts law that the notice necessary to start the statute running includes notice that defendant has breached a legal duty to plaintiff. The only indications are to the contrary. The statute does not begin to run until plaintiff knows he has been injured "as a result of conduct of defendants". *Olsen, supra,* 445 N.E.2d at 612. But knowledge that he has been injured by *negligent* conduct is something more and different. The Supreme Judicial Court's discussion of the discovery rule in *Franklin v. Albert, supra,* in which it adopted a discovery rule for medical malpractice claims, suggests that in the products liability context, notice that one has been harmed by defendant's conduct is knowledge that one has been harmed by defendant's product.

> "In *Cannon v. Sears, Roebuck & Co.,* 374 Mass. 739, 742–743 [374 N.E.2d 582] (1978), we held that *a cause of action in products liability cases accrues at the time a plaintiff is injured by a product,* not at the time, often years earlier, that the product is either manufactured or sold. These cases [*Cannon* and those cases adopting a discovery rule for legal malpractice cases and for deceit in the sale of real estate] all recognize the principle that a plaintiff should be put on notice before his claim is barred. We now extend this principle to medical malpractice actions and hold that these causes of action accrue *when the plaintiff learns, or reasonably should have learned, that he has been harmed by defendant's conduct."* 381 Mass. at 619, 411 N.E.2d 458 (emphasis added).

What *Olsen* apparently adds to *Cannon* is the recognition that notice that one has been injured by a product will not always be simultaneous with the actual injury. It does not require additionally that the plaintiff be on notice that the defendant breached a duty with regard to that product.

We think that under Massachusetts law notice of likely cause is ordinarily enough to start the statute running. Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim. Thus on notice, his cause of action is no longer inherently unknowable. He is in the same position as other tort plaintiffs who must determine whether the harm they have suffered is legally compensable. He has three years to do so. As the Supreme Court said in *Kubrick, supra,* with respect to the discovery rule for medical malpractice claims under the Federal Tort Claims Act,

> "A plaintiff ... armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community.... If advised that he has been wronged, he may promptly bring suit. If competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim. Of course, he may be incompetently advised or the medical community may be divided on the crucial issue of negligence, as the experts proved to be on the trial of this case. But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make." 444 U.S. at 123–24, 100 S.Ct. at 360.

■ Appellant advances four main factual arguments to support her contention that summary judgment should not have been granted. Her first contention is that Dr. Butler's statement of September 7, 1978 was merely speculative. But Dr. Butler's

language, as quoted by appellant in her deposition, although not evidencing a firm conviction of causation, was not neutral, ambiguous, hypothetical, or phrased in terms of mere possibility. It was enough to lift the issue of causation out of the realm of the "inherently unknowable" wrong. *Olsen v. Bell Telephone Laboratories, Inc., supra,* 445 N.E.2d at 612. Indeed, should stronger or more dogmatic opinions be required, relatively few limitations periods would be triggered in this kind of case.

A second argument, one with some appeal, is that appellant here acted both diligently and with commendable restraint. We should, we are urged, not stimulate plaintiffs to rush into litigation upon unsupported surmise. We think there are sound policy answers to this argument. Where a plaintiff, like appellant here, is unable despite due diligence to find authority to corroborate the suggested causation or to support legal liability, his claim may simply be inherently weak. In that case, there is no reason why the statute should not run. The plaintiff's failure to marshal support despite diligence may mean, however, that he has received poor medical, scientific, or legal advice. That result is unfortunate but is also no reason why the statute should not run; the same pitfall faces all plaintiffs, not just those whose causes of action are inherently difficult to discover. Certainly a litigant should not be discouraged from seeking additional professional opinion before rushing into court. But the claimant has the statutory period in which to do so. And a rule that starts the period running when the plaintiff is first put on notice of injury and cause rather than only when he has a basis to claim legal causation should not encourage the hasty filing of unsubstantiated legal claims, such claims being vulnerable to a motion to dismiss.

A third argument is that the more doubtful statements of opinion as to causation made by Dr. Butler subsequent to September 7, 1978, should be taken into account in assessing the import of his September 7 statements. But were we to consider later statements capable of raising an issue of fact as to notice of causation, notwithstand-

ing a more forceful earlier statement, the running of a limitations period would be subject to cancellation with every change in a doctor's thinking. Eleventh hour waffling could place the parties back at square one. Any hope for repose would be illusory.

Finally, appellant makes an argument which we accept in principle but which we deem inapplicable on the facts of this case. She urges that medical knowledge of causation was just not available as of September 7, 1978. Indeed, the state of medical or scientific knowledge may simply be such that causation of a plaintiff's harm is not sufficiently understood to support a legal claim. In such a case the plaintiff's diligence will be rewarded only after a breakthrough in scientific or medical understanding, and there is thus a rationale for delaying the running of the statute until after the breakthrough occurred. *See Stoleson, supra,* 629 F.2d at 1270–71 (thus distinguishing *Kubrick*).

But such is not the case here. There is no indication in the record that scientific understanding of the alleged causation has progressed since that causation was first suggested to appellant by Dr. Butler. The most recent of the scientific articles concerning the possible effects of Pantopaque contrast medium which appellant identified in discovery as supporting her claim was published in 1966. We must conclude therefore that either the statute has run or that the necessary support for appellant's theory of causation, though knowable, is not yet known. The latter supposition, though hypothetically delaying the running of the statute, can do so only retrospectively from the vantage point of the future scientific or medical breakthrough; and its corollary is that appellant has no claim supportable at present.

*The judgment of the district court is affirmed. The parties shall bear their own costs on appeal.*