USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1299 GAIL A. LAREAU AND MICHAEL LAREAU, INDIVIDUALLY AND AS PARENTS AND NEXT OF FRIENDS OF ASHLEY LAREAU AND CHRISTOPHER LAREAU, Plaintiffs, Appellants, v. LARRY K. PAGE, M.D., SEQUA CORPORATION, AND CHROMALLOY PHARMACEUTICAL, INC. Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin and Stahl, Circuit Judges. ______________ ____________________ Joan A. Lukey with whom Charles P. Kindregan and Hale and Dorr ______________ ____________________ ______________ were on brief for appellants. John D. Cassidy with whom John M. Dellea and Ficksman & Conley ________________ _______________ _________________ were on brief for appellee Larry K. Page, M.D. Lawrence G. Cetrulo with whom Kevin E. Young, David B. Frederick, ___________________ _______________ __________________ and Peabody & Arnold were on brief for appellees Sequa Corporation and ________________ Chromalloy Pharmaceutical, Inc. ____________________ November 14, 1994 ____________________ STAHL, Circuit Judge. Plaintiffs-appellants Gail STAHL, Circuit Judge. _____________ Lareau, her husband Michael Lareau, and their children, Christopher and Ashley Lareau, filed suit against defendants- appellees Dr. Larry K. Page and parent-subsidiary corporations Sequa Corporation and Chromalloy Pharmaceutical, Inc. (collectively, "CPI") for injuries arising from the injection of the contrast medium Thorotrast into Mrs. Lareau in 1970. All of the Lareaus appeal various pre-trial rulings of the district court, and Christopher appeals an adverse jury verdict in his loss-of-consortium action against Dr. Page, the only part of this case decided by a jury. We hold that the statutes of limitations bar all of the Lareaus' claims except their consumer-protection claims against Dr. Page and that the Lareaus are not entitled to recover on their consumer-protection claims against Dr. Page. Accordingly, we affirm the district court's entry of judgment for defendants. I. I. __ Background Background __________ In March 1970, Mrs. Lareau (then Gail Melanson, aged 17), suffering from severe headaches and flu-like symptoms, was admitted to Children's Hospital in Boston, where she came under the care of Dr. Page, a neurosurgeon. Fearing that Mrs. Lareau had a malignant brain tumor, Dr. Page performed a craniotomy and determined instead that she -2- 2 had a brain abscess, which is a life-threatening accumulation of pus that forms within a capsule of tissue in the brain. Dr. Page aspirated the abscess, which was approximately the size of a tennis ball. He then injected a small amount of Thorotrast, a radioactive contrast medium, into the abscess cavity to facilitate its post-operative radiologic observation. Dr. Page did not inform or warn Mrs. Lareau or her parents of the dangers of Thorotrast or obtain their consent for using it prior to injecting the substance into her abscess cavity. Four days later, using Thorotrast- enhanced x-rays, Dr. Page detected the recurrence of Mrs. Lareau's abscess. He aspirated the abscess again and, shortly thereafter, discharged Mrs. Lareau. Post-surgery, Mrs. Lareau remained healthy for fourteen years; she grew into adulthood, married Mr. Lareau and, in 1983, gave birth to their first child, Christopher. On June 13, 1984, however, Mrs. Lareau was admitted to the Burbank Hospital in Fitchburg, Massachusetts, suffering from severe headaches and a grand mal seizure. Her attending physician, Dr. Richard Cornell, noted that the CT scan taken on admission revealed "a large calcified mass in the left brain due to the old lesion." In the discharge summary, Dr. Cornell also noted "a density overlying the lateral aspect of the left frontal sinus . . . probably due to retained contrast [medium] placed at the time of the removal of her -3- 3 brain abscess, rather than calcification." Mrs. Lareau herself never saw these reports. Upon her discharge from Burbank Hospital, Mrs. Lareau was referred to Dr. Edwin G. Fischer, a neurosurgeon at Children's Hospital in Boston. Two weeks after she consulted with Dr. Fischer, Mrs. Lareau received a letter from him, dated July 6, 1984, in which he warned her that there was a "theoretical possibility" that "the Thorotrast that was left following treatment of your brain abscess" could "induce a tumor in surrounding brain tissue over a total period of about 20 years." Dr. Fischer's letter continued: Since it [the Thorotrast] is located in an area of brain that it would be safe to remove it from, I am recommending that it be removed to avoid the risk of a future tumor. Unfortunately I cannot tell you what the chances are of developing a tumor, but with the Thorotrast out I don't think you would have to worry about it further. On September 12, 1984, Mrs. Lareau went to Dr. R. Michael Scott, a neurosurgeon at New England Medical Center, for a second opinion. While confirming the existence of the Thorotrast, Dr. Scott did not recommend surgery. After consulting further with Dr. Cornell, Mrs. Lareau decided not to go ahead with surgery on, as she said in her deposition testimony, "just a theoretical possibility." -4- 4 Mrs. Lareau continued to consult Dr. Fischer, returning in September 1985 and March 1987 for cranial CT scans. Both scans indicated the presence of Thorotrast but no tumor formation. In 1986, between these two consultations, Ashley Lareau was born. In a letter dated November 11, 1988, Dr. Fischer again wrote to Mrs. Lareau: As you know, we have been concerned about the Thorotrast used to treat your brain abscess. The theoretical possibility has always been that the remaining material could cause the formation of a tumor. This past year a report of such a case has appeared in the neurosurgical literature, the tumor occurring 21 years after treatment of the abscess. I think this is sufficient cause for us to reconsider things and obtain a new scan . . . . Mrs. Lareau went to see Dr. Fischer in March 1989. Dr. Fischer again recommended surgery to remove the Thorotrast, this time referring to the report of brain cancer in the literature. On June 16, 1989, Mrs. Lareau watched a report on the dangers of Thorotrast on the ABC News program 20/20. _____ Mrs. Lareau maintains that she did not discover the harm done to her by defendants' actions until she saw the 20/20 report. _____ After the program, as she said in her deposition testimony, Mrs. Lareau was "an emotional wreck" and began to suffer -5- 5 worsening headaches and painful "pulling" sensations in her head. Almost a year later, in the spring of 1990, on the advice of her attorney, Mrs. Lareau went to Massachusetts General Hospital to see a neurologist, Dr. Amy Pruitt, who referred her to a neurosurgeon, Dr. Robert Ojemann. On August 13, 1990, shortly after Mrs. Lareau had begun legal action against Dr. Page and CPI, Dr. Ojemann operated on Mrs. Lareau to remove the Thorotrast. Mrs. Lareau's post-surgical report revealed a calcified mass, or granuloma, caused by the Thorotrast. Following surgery, Mrs. Lareau suffered painful cranial swelling and exhaustion, was unable to leave her house, and was readmitted for observation. Her emotional distress, the accompanying worsening headaches, and the surgery allegedly affected her relationship with her husband and caused both Ashley and Christopher to suffer emotional problems, for which Christopher received psychological counseling. On June 27, 1990, the Lareaus commenced their diversity action against Dr. Page and CPI. They brought suit against CPI for negligence, breach of warranty, failure to warn, loss of consortium, negligent infliction of emotional distress, and violations of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A. Their action against Dr. Page sought recovery for medical malpractice, loss of -6- 6 consortium, negligent infliction of emotional distress, and violations of chapter 93A. The district court granted defendants' motions for summary judgment based on the applicable statutes of limitations with regard to all claims brought by Mrs. Lareau, Mr. Lareau, and Ashley. The district court granted CPI's motion for summary judgment on Christopher's negligent-infliction-of-emotional-distress claim; later, at the close of all of the evidence in Christopher's trial against Dr. Page, the district court granted Dr. Page judgment as a matter of law on Christopher's negligent-infliction-of-emotional-distress claim.1 On the eve of trial, the district court also granted CPI's motion for summary judgment based on the learned-intermediary rule, which disposed of all of the Lareaus' claims against CPI. At the subsequent district court trial on Christopher's loss-of- consortium claim against Dr. Page, the jury returned a verdict for Dr. Page. This appeal followed. II. II. ___ Standard of Review Standard of Review __________________  ____________________ 1. Initially, the district court granted Dr. Page's motion for summary judgment on Christopher's negligent-infliction- of-emotional distress claim. Subsequently, the district court vacated the summary judgment ruling and directed a verdict in Dr. Page's favor on that issue "when it became apparent that the interests of justice would be served thereby." Lareau v. Page, 840 F. Supp. 920, 931 n.12 (D. ______ ____ Mass. 1993). As Fed. R. Civ. P. 50 no longer uses the term "directed verdict," we refer to the district court as having granted Dr. Page judgment as a matter of law. -7- 7 As always, we review a district court's grant of summary judgment de novo and, like the district court, review __ ____ the facts in a light most favorable to the non-moving party. See, e.g., Crawford v. Lamantia, 34 F.3d 28, 31 (1st Cir. ___ ____ ________ ________ 1994). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the nonmovant bears the burden of placing at least one material fact into dispute once the moving party offers evidence of the absence of a genuine issue. Crawford, 34 F.3d at 31; see also Celotex Corp. v. ________ ___ ____ _____________ Catrett, 477 U.S. 317, 322 (1986). _______ III. III. ____ Discussion Discussion __________ A. Massachusetts Statutes of Limitations and the Discovery _____________________________________________________________ Rule ____ In cases such as this one, where jurisdiction is based on diversity of citizenship, state statutes of limitations apply. See Fidler v. Eastman Kodak Co., 714 F.2d ___ ______ _________________ 192, 196 (1st Cir. 1983). Under Massachusetts law, the Lareaus' medical-malpractice, negligence, and breach-of- warranty claims are all subject to three-year statutes of limitations. See Mass. Gen. L. ch. 260, 4 (medical ___ -8- 8 malpractice); Mass. Gen. L. ch. 260, 2A (personal injury); Mass. Gen. L. ch. 106, 2-318 (breach of warranty). The Lareaus' consumer-protection claims are subject to a four- year statute of limitations. See Mass. Gen. L. ch. 260,  ___ 5A. The parties do not dispute that the Massachusetts discovery rule applies to the Lareaus' claims. Under the discovery rule, a cause of action accrues when a person (1) knows or has sufficient notice that s/he was harmed; and (2) knows or has sufficient notice of the cause of the harm. McGuinness v. Cotter, 591 N.E.2d 659, 665 (Mass. 1992); Bowen __________ ______ _____ v. Eli Lilly & Co., 557 N.E.2d 739, 742 (Mass. 1990). The ________________ plaintiff need not know the full extent of the injury before the statute begins to run. Bowen, 557 N.E.2d at 741. "The _____ important point is that the statute of limitations starts to run when an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury." Id. Once on notice, "`the ___ potential litigant has the duty to discover from the legal, scientific, and medical communities'" whether s/he has a claim. Id. at 742 (quoting Fidler, 714 F.2d at 199); see ___ ______ ___ also Catrone v. Thoroughbred Racing Ass'n of N. Am., Inc., ____ _______ ___________________________________________ 929 F.2d 881, 886-87 (1st Cir. 1991) (construing Massachusetts law). B. Application of the Discovery Rule to the Lareaus' Claims ____________________________________________________________ -9- 9 The Lareaus instituted this action on June 27, 1990. Accordingly, their claims are time barred if they accrued before June 27, 1987 (or June 27, 1986, in the case of their consumer-protection claims). The question before us, then, is whether the summary judgment record permits us to conclude that, as a matter of law, the Lareaus knew or had sufficient knowledge that they had been harmed before June 27, 1987 (or June 27, 1986). We discuss Mrs. Lareau's claims; the Lareaus' consumer-protection claims; and Mr. Lareau's, Christopher's, and Ashley's loss-of-consortium and emotional-distress claims in turn. 1. Mrs. Lareau's Claims ____________________ Mrs. Lareau argues that the earliest date on which her causes of action accrued was June 16, 1989, the day on which she watched the 20/20 program on Thorotrast. Mrs. _____ Lareau argues that before watching 20/20, she did not know _____ what Thorotrast was or that it was harming her; nor did she know that she had a Thorotrast granuloma in her brain. Mrs. Lareau also argues that she did not suffer emotional distress before watching 20/20. Because she instituted this action _____ approximately one year after watching 20/20, Mrs. Lareau _____ argues that her claims are well within the applicable limitations periods. We do not agree. Following careful review of the record, we hold as a matter of law that Mrs. Lareau had sufficient notice to -10- 10 have discovered her claims upon receipt of Dr. Fischer's July 6, 1984 letter. In that letter, Dr. Fischer informed Mrs. Lareau that she had Thorotrast in her brain, that there was a "theoretical possibility" that the Thorotrast could cause her to develop a brain tumor, and that she should have invasive brain surgery to remove it. Mrs. Lareau understood the import of Dr. Fischer's letter; as she said in her deposition testimony, she "was like in shock that anything was wrong," and "was pretty shooken [sic] up." Mrs. Lareau argues that she acted reasonably after receiving Dr. Fischer's letter but still failed to discover her claims. Accordingly, she contends, the statutes of limitations should not have begun to run in 1984. After reviewing the record, however, we cannot say that Mrs. Lareau acted reasonably. Though she did seek additional opinions from Drs. Scott and Cornell, at no point did she ever make the most basic inquiry about what Thorotrast was or how it might have been harming her. For this reason, her argument that her causes of action did not accrue in July 1984 because she was not told then what Thorotrast was must fail. Mrs. Lareau next contends that her causes of action did not accrue in 1984 because she was not told then that she had a calcified mass, or granuloma, in her brain.2 While  ____________________ 2. Because we must construe all of the facts in the light most favorable to Mrs. Lareau, we assume that Thorotrast caused Mrs. Lareau's granuloma and that it was not the -11- 11 Mrs. Lareau was not told in 1984 that she had a calcified mass in her brain, Mrs. Lareau's doctors noted it on her medical charts at that time. Had Mrs. Lareau inquired as to whether Thorotrast had caused any damage, her physicians might have told her that it could have been the cause of the calcification. Additionally, had Mrs. Lareau asked to see her medical charts, she herself would have seen the notation regarding the calcification. Mrs. Lareau argues, relying on McGuinness v. __________ Cotter, 591 N.E.2d 659, 666 (Mass. 1992), that because she ______ did not actually see her medical charts, the fact that her doctors noted her calcification on them does not matter. We do not agree. In McGuinness, the Massachusetts Supreme __________ Judicial Court ("SJC") held that where a mother had no notice that her son's cerebral palsy might have been caused by medical malpractice, the fact that such cause was contemplated in a doctor's report that she never saw did not trigger the statute of limitations. Id. Unlike Mrs. ___ McGuinness, Mrs. Lareau had notice that there was a problem; she had been advised that she had a chemical in her brain that could cause cancer, that its removal required brain surgery, and that removal was recommended. Therefore, unlike Mrs. McGuinness, who did not suspect and who had no reason to suspect a problem, and who therefore had no reason to ask the  ____________________ natural consequence of her brain abscess. -12- 12 doctor to see his report, Mrs. Lareau was on notice and therefore had reason to investigate further. As for her negligent-infliction-of-emotional- distress claims, Mrs. Lareau states that she did not suffer distress until she watched 20/20 in 1989 and therefore that, _____ regardless of when her other claims accrued, her emotional- distress claims did not accrue until then. We do not agree. In Massachusetts, [w]here plaintiffs have suffered directly inflicted personal injuries as a result of a defendant's negligence, courts have not been reluctant to allow recovery for emotional distress, occurring _________ contemporaneously with those personal _________________________________________ injuries, as an additional element of ________ damages. In these cases, recovery for emotional distress [is] allowed as a claim `parasitic' to the `host' claim of damages for negligently inflicted physical injuries. Payton v. Abbott Labs, 437 N.E.2d 171, 176 (Mass. 1982) ______ ____________ (citations omitted) (emphasis added). We think that the SJC would apply the discovery rule to "parasitic" claims such that they may be brought when they occur contemporaneously with the discovery of the "host" claim. In this case, however, we have held as a matter of law that Mrs. Lareau should have discovered her "host" claims in July 1984. We think that Massachusetts would not allow "parasitic" claims to defeat the purposes of the discovery rule such that plaintiffs who fail to discover their "host" claims in time may nonetheless sue for later-discovered "parasitic" claims. -13- 13 Therefore, we hold that Mrs. Lareau's "parasitic" claim for negligent infliction of emotional distress is barred. In sum, we hold, as a matter of law, that Mrs. Lareau had sufficient notice to have discovered her claims in 1984. Accordingly, with the exception of her consumer- protection claim against Dr. Page, which we discuss below, all of Mrs. Lareau's causes of action accrued in 1984 and are therefore time barred. -14- 14 2. Chapter 93A ___________ The Lareaus argue that their chapter 93A claims against Dr. Page did not accrue until 1990. The Lareaus base their chapter 93A claims against Dr. Page on the fact that in 1984, when apparently contacted by Dr. Scott (with whom Mrs. Lareau consulted), Dr. Page responded, "within the current `ambiosis litigiosus', she [Mrs. Lareau] should be made aware of the theoretical possibility that the Thorotrast may induce a neoplasm." The Lareaus argue that Dr. Page committed an unfair and deceptive act to the extent that he orchestrated a plan to give Mrs. Lareau some sort of "notice" to trigger the statute of limitations on her other claims, but not enough to trigger any actual awareness of his negligence. In light of the fact that the risk that Thorotrast could induce a brain tumor when left in an abscess cavity was merely theoretical until 1988, we hold that, as a matter of law, Dr. Page did not violate chapter 93A when he recommended that Mrs. Lareau be told of that theoretical possibility.3 3. Loss of Consortium __________________ Mr. Lareau, Christopher, and Ashley allege that they did not suffer any loss of consortium until June 1989, when Mrs. Lareau became an "emotional wreck" after she  ____________________ 3. Because the Lareaus did not address in their brief when their chapter 93A claims against CPI accrued, we consider the argument as to CPI waived. See Alan Corp. v. International ___ __________ _____________ Surplus Lines Ins. Co., 22 F.3d 339, 343-44 (1st Cir. 1994). ______________________ -15- 15 watched the 20/20 program on Thorotrast. Thus, Mr. Lareau, _____ Christopher, and Ashley allege that they did not suffer any loss of consortium until after Mrs. Lareau's claims were already barred by the applicable statutes of limitations. Mr. Lareau, Christopher, and Ashley argue, however, that even if Mrs. Lareau's claims are time barred, their claims are nevertheless timely filed because they did not accrue until 1989. Massachusetts limits children's loss-of-consortium claims to those children who are conceived before the parent's injury. Angelini v. OMD Corp., 575 N.E.2d 41, 43 ________ _________ (Mass. 1991). As Ashley was born in 1986, after her mother's causes of action accrued, Ashley is barred from bringing her loss-of-consortium claims.4 Massachusetts courts have not addressed, outside the context of after-born children, whether loss-of- consortium claims that accrue after the statute of limitations has run on the underlying injury may be enforced. "Absent controlling state court precedent, a federal court  ____________________ 4. We agree with the district court that Massachusetts would incorporate its discovery rule such that children who are conceived before the parent discovers his/her claim -- in other words, who are conceived before the parent's cause of action accrues -- may recover for loss of parental consortium. See Lareau v. Page, 840 F. Supp. 920, 930 (D. ___ ______ ____ Mass. 1993). Thus, Angelini does not bar children who are ________ conceived after the parent's injury but before the parent's cause of action accrues. Because Christopher was born in 1983, before his mother's causes of action accrued, his claims are not automatically barred under Angelini. ________ -16- 16 sitting in diversity may certify a state law issue to the state's highest court, or undertake its prediction when the course the state courts would take is reasonably clear." VanHaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 _________ ________________________________ (1st Cir. 1993) (quotation and citations omitted). We think it is reasonably clear that the SJC, if faced with the issue, would hold that after-arising loss-of-consortium claims accruing after the statute of limitations has run on the underlying injury cannot be enforced. Under Massachusetts law, claims for loss of consortium are independent, rather than derivative, of the claim of the injured person. See Olsen v. Bell Tel. Lab., ___ _____ _______________ Inc., 445 N.E.2d 609, 612 (Mass. 1983). "Since the causes of ____ action are independent, the date of accrual of each action must be determined separately." Id. at 613. This arguably ___ implies that a claim for loss of consortium may accrue after the cause of action for the underlying injury and therefore that the loss-of-consortium plaintiff may be able to bring his/her claim after the injured person is barred. As noted above, however, Massachusetts recognizes that it is important to limit after-arising loss-of- consortium claims. In limiting children's loss-of-consortium claims to those children who are conceived before the parent's injury, the SJC explained: If no restriction is placed on the class of children who are eligible to recover -17- 17 for loss of parental consortium, a defendant may become liable for the loss of consortium several years, perhaps even decades, after the injury to the parent. As a matter of policy, however, it is _________________________________________ important to limit the duration of the _________________________________________ liability. __________ Angelini, 575 N.E.2d at 43 (emphasis added).  ________ We think that the SJC, if faced with the issue, would extend this reasoning to limit the duration of liability for loss-of-consortium claims generally, such that loss-of-consortium claims that do not accrue until after the statute of limitations has run on the underlying injury may not be enforced.5 If no such rule is imposed, then "a defendant may become liable for the loss of consortium several years, perhaps even decades, after the injury." Id. ___ Because Mr. Lareau and Christopher allege that they did not suffer any loss of consortium until 1989, their claims accrued after Mrs. Lareau's claims were barred. Accordingly, we hold that Mr. Lareau and Christopher may not enforce their claims under Massachusetts law. 4. Mr. Lareau's, Christopher's, and Ashley's _______________________________________________ Negligent-Infliction-of-Emotional-Distress Claims _________________________________________________ Mr. Lareau, Christopher, and Ashley also bring claims for negligent infliction of emotional distress. In these claims, Mr. Lareau, Christopher, and Ashley seek to  ____________________ 5. We note that Massachusetts bars recovery even to children who are born during the parent's statutory period. See ___ Angelini, 575 N.E.2d at 43. ________ -18- 18 recover for injuries arising from their concern over harm to Mrs. Lareau, specifically her brain surgery and her continued uncertain prognosis. Massachusetts does not apply the discovery rule to claims for negligent infliction of emotional distress brought to recover for injuries arising from concern over harm to another. See Gore v. Daniel O'Connell's Sons, Inc., 461 ___ ____ _______________________________ N.E.2d 256, 260 (Mass. App. Ct. 1984) ("the [emotional- distress] claims fail because they are tied by the amended complaint to the date of claimed awareness of Gore's condition, i.e., almost three years after the accident"). Rather, in addition to the physical injury required for all emotional-distress claims, "bystander" plaintiffs must show physical proximity to the accident, temporal proximity to the negligent act, and familial proximity to the victim. Anderson v. W.R. Grace & Co., 628 F. Supp. 1219, 1229 (D. ________ _________________ Mass. 1986) (summarizing Massachusetts cases). Mr. Lareau, Christopher, and Ashley cannot show physical or temporal proximity to Mrs. Lareau's 1970 operation, in which she was allegedly negligently injected with Thorotrast. Accordingly, their emotional-distress claims fail. IV. IV. ___ Conclusion Conclusion __________ -19- 19 We hold that all of the Lareaus' claims, with the exception of their chapter 93A claim against Dr. Page, were barred by the applicable statutes of limitations and that Dr. Page is entitled to judgment as a matter of law on the Lareaus' chapter 93A claims against him. Affirmed. Affirmed. _________ -20- 20