Lauriat, Peter M., J.
Helene K. Murphy (“Murphy”), filed this action against Novartis Consumer Health, Inc. (“Novartis”) and Medi-Rite Pharmacy (“Medi-Rite”) on March 9, 2001, alleging claims of negligence, breach of warranty, and violation of G.L.c. 93A, arising from a stroke she suffered on August 28, 1993. Murphy contends that her stroke was caused by a drug, phenylpropanolamine (PPA), contained in Tavist-D, which she had taken for the first time on August 28, 1993. Tavist-D was developed and manufactured by Novartis and distributed by Medi-Rite. Novartis and Medi-Rite (collectively “the defendants”) have now moved for summaiy judgment on the ground that the applicable statutes of limitation, three years for negligence and breach of warranty, and four years for violation of c. 93A, have expired. For the following reasons, the defendants’ summaiy judgment motion is denied.
BACKGROUND
The undisputed material facts and the disputed material facts viewed in the light most favorable to Murphy, as revealed by the summary judgment record, are as follows. On the night of August 28, 1993, Murphy experienced a bleed in her brain, resulting in a diagnosis of subarachnoid hemorrhage (SAH), a form of hemorrhagic stroke. According to Murphy, earlier that evening she took a 75 mg tablet of Tavist-D for relief from seasonal allergies. She then went to sleep and awakened three hours later with what she described as an excruciating headache. Murphy sought treatment at Harrington Memorial Hospital, where she reported her ingestion of Tavist-D to the intake personnel and treating providers in the Emergency Room. Later in the night of August 28, Murphy was transferred from Harrington Memorial Hospital to the University of Massachusetts Medical Center in Worcester *691 (“UMMC”). Murphy’s husband remembers his wife telling every person at the hospital involved with her intake that she had taken Tavist-D. On August 30, 1993, Dr. Jamie Baisden, the chief neurology resident, described to the Murphys that she had a bleed, but neither Mr. nor Mrs. Murphy can remember any other specifics of their conversation with Dr. Baisden. On September 2, 1993, Murphy sought treatment from Dr. Christopher Ogilvy, a neurosurgeon at Massachusetts General Hospital (MGH), who admitted her to the hospital for a period of five days.
Dr. Ogilvy, when speaking to Murphy about the possible cause of her hemorrhage, mentioned that he thought that she might have suffered an “AVM,” which is a leak in a pre-existing malformed blood vessel in her brain. Although Dr. Ogilvy offered the AVM as a possible cause of Murphy’s stroke, he never stated that the bleed was in fact from an AVM.[1] Murphy understood that Dr. Ogilvy was tiying to determine precisely what caused her hemorrhagic stroke.[2] Murphy had numerous conversations with her doctors regarding why she suffered a hemorrhage.[3] From February 1994 to 2001, Murphy was seen on a regular basis by Dr. Paula Ravin, a neurologist at UMMC, who maintained notes of Murphy’s visits throughout this time. Dr. Ravin was not asked to diagnose Murphy, but rather, provided treatment for the injuries she sustained as a result of her hemorrhagic stroke. Dr. Ravin’s notes, which covered sixteen visits with Murphy between 1994 and 2001, contain no indication that Murphy ever inquired as to the possible cause of her bleed.
Murphy first became aware of information linking PPA to hemorrhagic stroke in 2001. On October 5, 2001, Dr. Ravin’s notes reflect a conversation with Murphy regarding the possible connection between her SAH and the Tavist-D she took on the day of her stroke.
PROCEDURAL HISTORY
Murphy filed this action against the defendants on March 9, 2001, alleging negligence, breach of warranty, and violation of G.L.c. 93A. On May 21, 2001, the defendants moved to dismiss the Complaint pursuant to Mass.R.Civ.P. Rule 12(b)(6), on the ground that Murphy had failed to state a claim upon which relief could be granted because the complaint revealed that the action was filed beyond the expiration of the applicable statutes of limitation. Murphy thereupon amended her complaint to include an allegation that the statutes of limitation were tolled under the discovery rule. The defendants now seek summary judgment attacking Murphy’s assertion that accrual of her causes of action were tolled by the discovery rule.
DISCUSSION
Summary judgment will be granted where there are no genuine issues as to any material fact, and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The court views the facts in the light most favorable to the non-moving party. Williams v. Hartman, 413 Mass. 398, 401 (1992). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue “even if he were to have no burden on an issue if the case were to go to trial.” Pederson v. Time, Inc., 404 Mass. 14, 17(1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805 , 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Claims of negligence and breach of warranty must be commenced within three years after the cause of action accrues. G.L.c. 260, §2A; G.L.c. 106, §2-318. Chapter 93A claims must be brought within four years after the cause of action accrues. G.L.c. 260, §5A. Generally, a cause of action accrues when the plaintiff is injured. Riley v. Presnell, 409 Mass. 239,243 (1991). However, under the discovery rule, a cause of action accrues, for purposes of statute of limitation analysis, when a plaintiff has “(1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was.” Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990). For Murphy, and for the plaintiff in Bowen, “the plaintiff was always well aware that she had sustained substantial physical harm.”
The question therefore is whether Murphy was “sufficiently on notice as to the cause of her physical harm.” Id. at 207. Applying Massachusetts law, the United States Court of Appeals for the First Circuit addressed the question of what level of notice about causation a plaintiff must receive before the statute of limitations is triggered. See Fidler v. Eastman Kodak Co., 714 F.2d 192, 199 (1st Cir. 1983). In reaching its decision, the First Circuit noted the difficulties inherent in determining sufficient notice of causation, when the existence of causation would likely be vehemently contested at trial. “Defining how much notice of cause is enough notice is inherently problematic where, as here, establishment of actual causation is itself an issue to be resolved at trial on the merits. If cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statute until cause, when at issue, had been resolved at trial. See Dawson v. Eli Lilly Co., 543 F.Sup. 1330, 1334 (D.D.C. 1982). Such a definition would entirely defeat the purposes of a statute of limitations in this class of cases, and we know of no court which has gone so far.” Fidler, 714 F.2d at 198.
*692 Recognizing that the statute of limitations would be all but destroyed by a strict causal notice requirement, the court set a lesser standard. It concluded “that under Massachusetts law notice of likely cause is ordinarily enough to start the statute running.” Fidler, 714 F.2d at 199. This court must determine whether the defendants have established that they are entitled to judgment as a matter of law because the undisputed facts show that Murphy had notice of the likely cause of her injuiy.
The parties dispute several facts in their Statements of Undisputed Facts required by Superior Court Rule 9A. Of the disputed facts, one is particularly material to the statute of limitations analysis because it sheds light on whether Murphy was on notice of the cause of her injury. Zimmerman v. Kent, 31 Mass.App.Ct. 72, 78 (1991) (defining materiality as “whether a reasonable man would attach importance [to the fact at issue] in determining his choice of action in the transaction at issue”). The defendants contend that the summary judgment record lacks evidence showing that Murphy inquired of any of her doctors as to the possible cause of her bleed, and that such a lack of inquiry on the issue of causation precludes Murphy’s invocation of the discovery rule. Murphy disputes this assertion, and offers deposition testimony of her husband, Kevin Murphy, and an affidavit she executed after her January 13, 2003 deposition. The deposition testimony of Kevin Murphy does not strongly support either party’s contentions because Mr. Murphy testified that he did not remember discussions about the cause of his wife’s injuiy. K. Murphy Dep., 48:15-49:9; Bliss Aff. Ex. 13. However, in Murphy’s post-deposition affidavit, she states that “my husband and I met with another treating neurosurgeon, Dr. Chris Ogilvy, and we also discussed what he thought could have happened to cause my hemorrhage. It was my understanding from that meeting that, as with my doctors at UMMC, he wasn’t sure what caused my bleed." H. Murphy Aff. ¶ 7, Bliss Aff. Ex. 14.
It is veiy important, when determining whether Murphy had notice of the likely cause of her injuiy, to know what she was told by her doctor. A patient with an entirely justifiable lack of knowledge about complicated medical issues would still seemingly be on notice of some relation between a stroke and an over-the-counter allergy medicine if she was so informed by her doctor. The defendants note that if Dr. Ogilvy was not on notice, then PPA must not have caused the bleed. This is simply not the case. That Dr. Ogilvy was unaware of some connection between PPA and Murphy’s bleed merely emphasizes the unlikeliness that Murphy would have been on notice of any causal connection between PPA and her injuiy. Under the discovery rule, representations made to Murphy by her doctor about the cause of her bleed are of material importance to the determination of when the statute of limitations was triggered. Since the parties do not agree on this fact, this case is not resolvable by summaiy judgment. Moreover, even if Murphy had never discussed causation with any of her doctors, the “question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact.” Riley v. Presnell 409 Mass. 239, 240 (1991).
ORDER
For the foregoing reasons, the defendants’ Motion for Summaiy Judgment is DENIED.

defendants contend that Dr. Ogilvy and Murphy discussed that her hemorrhage did in fact take the form of a leak of a pre-existing malformation, referred to as an AVM.

defendants contend that not only did Murphy know that Dr. Ogilvy was looking for the cause of her stroke, but also that Murphy never discussed with Dr. Ogilvy why the bleed happened.

defendants contend that Murphy never inquired of Dr. Ogilvy, or any other physician as to the cause of the leak.