**ESTANCIAS LA PONDEROSA DEVELOPMENT CORP., Plaintiff–Appellant,**

v.

**Hilda Soltero HARRINGTON, et al., Defendants–Appellees.**

**Civil No. 94–1690 (DRD).**

United States District Court, D. Puerto Rico.

May 13, 1996.

Jose L. Novas–Dueno, Hato Rey, PR, for appellees Harrington and Durand–Manzanal.

Luis A. Melendez–Albizu, Sanchez Betances & Sifre, San Juan, PR, for appellant Estancias La Ponderosa Development Corporation.

Rafael Durand–Manzanal, Trustee, San Juan, PR.

### *OPINION AND ORDER*

DOMINGUEZ, District Judge.

Plaintiff appeals from the Bankruptcy Court's order denying its demand that the

Trustee specifically perform his contract with Plaintiff for the sale of a certain tract of land belonging to the Debtor's estate. For the reasons described below, the Court affirms the Bankruptcy Court's order.

## I. Facts

In accordance with the confirmed plan for the reorganization of the estate, the bankruptcy Trustee, Mr. Rafael Durand Manzanal,[1] targeted for sale a tract of land located in the Bayamón Ward of the Municipality of Cidra, Puerto Rico. At the time that the parties entered into negotiations, this tract had already been subdivided and some units had been sold off. According to the records in the Registry of Property, the remaining land covered an area of 416.4033 *cuerdas*.[2]

Mr. Jan Edward Helfeld, president of plaintiff Estancias La Ponderosa Development Corp. ("La Ponderosa"), became aware that this property was available and approached the Trustee to negotiate the sale of some portion of it. Mr. Helfeld intended to improve the land, segregate it into lots, and sell these to buyers seeking to build residences. As a result of these negotiations, La Ponderosa and the Trustee executed on February 19, 1985, a contract entitled "Contract of Option of Purchase of Sale" (the "Option Contract"). The Option Contract provided, among other things, that a parcel of land of approximately 340 cuerdas, to be segregated from the main parcel along the boundaries identified in the map that was adjoined to the contract, would be sold at $3,000.00 per cuerda, the actual area being determined subsequently by a surveyor at the buyer's expense.

Moreover, the parties specifically negotiated a clause guaranteeing that La Ponderosa would not have to purchase more than 340 cuerdas.

By an order dated May 16, 1985, the Bankruptcy Court approved the Option Contract. Just over a week later, on May 24, 1985, the parties to the Option Contract executed an agreement entitled "Deed of Segregation, Release, Mortgage and Release" (designated by both parties to the appeal as "Deed No. 75") before a notary public. By means of Deed No. 75, in a nutshell, the Trustee segregated the La Ponderosa property from the property of the Debtor's estate along the boundaries agreed to in the Option Contract, described the two resultant parcels on the basis of their boundaries and area, and conveyed to La Ponderosa the segregated parcel of land. The deed also required La Ponderosa to carry out a survey of the land, at its own expense. The Bankruptcy Court approved this sale on July 16, 1985.

The genesis of this litigation was the subsequent survey, which revealed that the La Ponderosa property was comprised of only 284.1226 cuerdas. This represented a shortfall of 55.8774 cuerdas from the 340 cuerdas stated in both the Option Contract and Deed No. 75. The survey also demonstrated that the remnant parcel, south of Cidra Lake, encompassed only 66.4035 cuerdas, not the 76.4033 cuerdas expressed in Deed No. 75.

La Ponderosa then requested that the Trustee deliver the remaining 55.8774 cuerdas by segregating them from the remnant parcel described at paragraph Five of Deed No. 75, that is, from the land south of the

---

[1]. Debtor Hilda Soltero–Harrington, now deceased, filed in 1979 for protection under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C.A. § 101 et seq. (1993). *In re Hilda Soltero Harrington*, Bankr. No. 79–00408 (SEL). Mr. Rafael Durand was appointed by the Bankruptcy Court to oversee the Chapter 11 proceedings as Trustee to the estate.

[2]. This original parcel was registered and described as follows: "Tract of land of Four hundred sixteen point four thousand thirty three (416.4033) cuerdas approximately equivalent to one million six hundred thirty six thousand twenty seven square meters, approximately located in the Bayamón Ward, Municipality of Cidra, Puerto Rico; with boundaries on the North with

lands of Gregorio Cotto, Carmelo Ortiz, Carmelo Hernández, and Jorge Ortiz Toro; on the South, with public road number one hundred and seventy two (172); on the East, with lands of the estate of María Sariego, Dr. Mariñelarena, Loprey Rattan, Inc., and SKF & Co.; and on the West with the Cidra Lake, and with lands of Juan Pedraza Negrón and SKF & Co." (Our translation).

This real property appears recorded at Folio 150 of Volume 114, Cidra, property no. 4785, in the Registry of Property for the Caguas section. Note that one "cuerda" equals 3930.396 square meters; that is, just about 98% of an acre. *See Culebras Enterprises Corp. v. Rivera–Ríos,* 846 F.2d 94, 95 (1st Cir.1988).

Cidra Lake. The Trustee refused, but offered instead to accept a reduction in the sale price proportionate to the reduction in area, that is, from $1,020,000 down to $850,840. La Ponderosa paid the reduced price but refused to waive its claim to the full 340 cuerdas it understood it was entitled to receive under the terms of Deed No. 75.

La Ponderosa went on to file an adversary proceeding before the Bankruptcy Court, seeking the delivery of the full 340 cuerdas, reimbursement of interest expenses incurred as a result of the Trustee's alleged breach, and compensation for consequential damages and loss of income resulting from the Trustee's failure to deliver the full 340 cuerdas. After various procedural incidents, the Bankruptcy Court held a two-day bench trial, and on January 8, 1990, issued the Opinion and Order that La Ponderosa is now appealing.

The Bankruptcy Court held for La Ponderosa on various claims, but it denied the request for the delivery of the remaining 55.8774 cuerdas. Instead, it merely ordered the delivery of a strip of land north of the Cidra Lake, of approximately 9 cuerdas, that had not originally been turned over. The Bankruptcy Court determined that "the trustee obligated himself to sell all of the land within said boundaries up to 340 cuerdas, and should there be more than 340 cuerdas, then the land south of the imaginary line and north of [the] Quebrada Prieta, the tract referred to as Part A, would be excluded." *Opinion and Order*, at 15. The Court further concluded that pursuant to the contractual agreement and Art. 1358, La Ponderosa was entitled only to a reduction in the sale price.

Not satisfied with this result, La Ponderosa appealed to this Court, arguing that the Bankruptcy Court misinterpreted the clear and unambiguous terms of Deed No. 75 and the intent of the parties, and that pursuant to P.R.Civil Code Article 1358, it is entitled to delivery of the missing 55.8774 cuerdas.

## II. Jurisdiction

The Court has appellate jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) and Fed.R.Bankr.P. 8001(a). As discussed below, the Debtor was entitled to appeal as of right from the Bankruptcy Court's order, and the appeal was timely filed.

A party may appeal as of right from a bankruptcy court's final judgment, order, or decree. 28 U.S.C. § 158(a)(1) (1993 & West Supp.1995); Fed.R.Bankr.P. 8001(a).[3] In contrast, if the order or decree is not final, the party may appeal only by leave of the district court or bankruptcy appellate panel, as the case may be. 28 U.S.C.A. § 158(a)(3); Fed.R.Bankr.P. 8001(b) & 8003.[4]

According to some commentators, courts have applied "a more lenient standard of finality" in bankruptcy proceedings than in nonbankruptcy cases. 6 *Chapter 11 Theory and Practice: A Guide to Reorganization* § 34.13 at 34:16 (James F. Queenan, Jr. et al. eds., 1994). However, the difference between the bankruptcy and ordinary civil definitions of finality would be better described as not resulting from any leniency, but instead from the more complicated nature of a bankruptcy case, which in the normal course of events is composed of a multiplicity of discrete proceedings. As one court has noted, there is "[a]n uninterrupted tradition of judicial interpretation in which courts have viewed a 'proceeding' within a bankruptcy case as the relevant 'judicial unit' for purposes of finality." *In re Saco Local Develop-*

---

**3.** The court notes that Section 158(a)(2) also grants the district courts of the United States jurisdiction over appeals "from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title." These appeals are from orders increasing or decreasing the period of exclusivity that the debtor in possession enjoys to propose a reorganization plan, and so are not pertinent to the case at hand.

**4.** Some courts have perceived an ambiguity in § 158(a)(3), because its language "with leave of the court" does not specify whether the court whose leave is required is the bankruptcy or the district court, or both. We find no such ambiguity, and neither does the First Circuit. *In re Spillane,* 884 F.2d 642, 645 (1st Cir.1989). As the Advisory Committee Notes to Fed.R.Bankr.P. 8003 indicate, "[t]he motion for leave to appeal is addressed to the district court or the bankruptcy appellate panel, although filed with the clerk of the bankruptcy court."

*ment Corp.,* 711 F.2d 441, 445 (1st Cir.1983). Thus, instead of "end[ing] the litigation on the merits and leav[ing] nothing for the court to do but execute the judgment,"[5] in bankruptcy an order "need not dispose of all aspects of a case in order to be final; an order which disposes of a 'discrete dispute within the larger case' will be considered final and appealable.... The order in question must, however, 'conclusively determine' the dispute." *In re American Colonial Broadcasting Corp.,* 758 F.2d 794 (1st Cir. 1985) (quoting *In re Saco,* 711 F.2d at 444).

Pursuant to the criteria delineated above, the Court concludes that the Bankruptcy Court's order of January 8, 1990, is a final order for purposes of 28 U.S.C. § 158(a)(1) and Fed.R.Bankr.P. 8001(a). The order's effect was to conclusively decide on the merits the parties' rights in the adversary proceeding below, and the Plaintiff was therefore entitled to appeal, as of right, from that order.

## III. Standard of Review

A dispute over the Bankruptcy Court's decision denying the Plaintiff's request that the Trustee be ordered · to specifically perform the contract for the sale of some of the estate's property is a core proceeding. Pursuant to 28 U.S.C. § 157(b)(2)(N) & (O), "[c]ore proceedings include, but are not limited to ... orders approving the sale of [estate] property ...; and ... other proceedings affecting the liquidation of the assets of the estate."

The standard for reviewing a bankruptcy judge's decisions in core proceedings is considerably more deferential than the one applicable to decisions in non-core proceedings. In non-core proceedings bankruptcy judges are limited to submitting "proposed findings of fact and conclusions of law to the district judge, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."

11 U.S.C. § 157(c)(1); *see also* Fed. R.Bankr.P. 9033(d). Bankruptcy decisions in non-core proceedings are not subject to Section 158's provisions, and they are due little, if any, deference from the reviewing district courts.

A bankruptcy judge's authority is broader in core proceedings. Subsection 157(b)(1) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." Bankruptcy Rule 8013 provides that "[o]n appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *See In re LaRoche,* 969 F.2d 1299, 1301 (1st Cir.1992). Findings of fact in bankruptcy proceedings, as in other civil cases, are clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

In comparison, a bankruptcy court's conclusions of law are reviewable de novo, by analogy to "the familiar standards of review normally employed in appeals to the courts of appeals in civil cases generally." *In re LaRoche,* 969 F.2d at 1301; *see also Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir.1994) (citing *In re LaRoche,* 969 F.2d 1299); *In re DN Associates,* 3 F.3d 512, 515 (1st Cir. 1993); *In re G.S.F. Corp.,* 938 F.2d 1467, 1474 (1st Cir.1991) (citing supporting authority in various other circuits); *In re Gonic*

---

**5.** *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633–34, 89 L.Ed. 911 (1945). This is the standard of finality for ordinary civil cases.

*Realty Trust,* 909 F.2d 624, 626 (1st Cir. 1990).[6]

## IV. Analysis

This appeal presents a pure issue of Civil law. As noted above, the La Ponderosa parcel was found to be smaller than expected, by 55.8774 cuerdas. The question is, what are a buyer's remedies for such a shortfall? Plaintiff-appellant La Ponderosa argues that its contract with the Trustee was for the sale of real property on the basis of a certain price per unit of area, and that P.R.Civil Code Art. 1358 provides that such contracts must be specifically performed. Defendant-appellee Trustee agrees that the contract fell under the scope of Art. 1358, but denies that the proper remedy is specific performance, asserting instead that an action *quanti minoris,* for the reduction of the sale price, is the exclusive remedy for any shortfall.

### A. The Contract for the Sale of Real Property under the Civil Code

█ As a preliminary matter, the Court notes that there is nothing inherently unreasonable in a plaintiff's request for specific performance as a remedy for the breach of a contractual agreement. Unlike the common law, the Civil law has never distinguished between legal and equitable remedies. To the contrary, specific performance is routinely available as a remedy for breach of contract; pursuant to P.R.Civil Code Art. 1358, the vendor has the obligation "of placing in the possession of the vendee all that is mentioned in the contract." P.R.Laws Ann. tit. 31, § 3818 (Official translation 1990). More to the point, so long as sales of real property are made "with a statement of its area, at the rate of a certain price for a unit of measure or number, the vendor shall be obliged to deliver to the vendee ... all that may have been mentioned in the contract." *Id.*

However, it is not immediately obvious how to require specific performance when a tract of land is discovered to be smaller than originally thought by the parties. As the Spanish commentator José Castán–Tobeñas has noted,

"there shall be no difficulty [in requiring specific performance] when dealing with the sale of personal property ... or of real property, if it is sold as a certain body, for one price.... But if real property is sold with an indication of area, for a certain price per unit of measure, ... difficulties may arise if the area turns out to be greater or lesser than that indicated in the contract of sale. In order to resolve these difficulties, the Code sets forth the following rules, inspired in the desire to interpret the will of the parties and to seek equity." (Our translation).

José Castán–Tobeñas, 4 *Derecho Civil Español, Común y Foral* 113–14 (15th ed. 1993) (discussing Spanish Civil Code Art. 1469, from which Art. 1358 is derived); *see also* Eduardo Vázquez–Bote, 9 *Tratado Teórico, Práctico y Crítico de Derecho Privado Puertorriqueño* 165 (1992); Federico Puig–Peña, 4 *Tratado de Derecho Civil Español* 139 (2d ed. 1973).

The problem lies in that real property is not a fungible good. Location is an essential element in any contract for the sale of real property, for the value of land will largely depend on where it is located and what other properties surround it. Compare, for example, the consequences of a shortfall in the quantity delivered in the sale of generic tennis balls versus in the sale of a plot of land on a price-per-unit-of-area basis. A buyer of tennis balls would presumably have no complaint if the seller made up for any shortfall in the quantity delivered by purchasing extra balls from the manufacturer and delivering them to the buyer. In contrast, one suspects that the buyer of land would object if the seller tried to make up for the shortfall in area by delivering title to a plot of land located elsewhere.

This difference is a matter of the parties' intent. In the first case the buyer would receive what he or she bargained for (a given number of generic tennis balls). In the second case, the buyer bargained for a certain

---

6. Finally, discretionary decisions are reviewed under an abuse of discretion standard. *In re Gonic,* 909 F.2d at 626 ("[d]iscretionary rulings made pursuant to the Bankruptcy Code are reviewable only for abuse of discretion").

number of cuerdas at a certain location for a certain price per cuerda; instead, he obtained part of the cuerdas bargained for at the location originally agreed to, but the rest at a different location. But what if the second plot has a lower price per cuerda? Does the seller then deliver the same number of cuerdas as originally agreed? Or does he deliver a number of cuerdas worth the same amount as the cuerdas he should have delivered? What if the buyer does not want to purchase a greater area of land? What if the buyer wanted a contiguous plot of land at a particular location? It is reasonable to presume that in most cases a buyer would not have entered into the contract if the seller could meet his obligations this way.

The Civil Code establishes special rules governing the performance of contracts in circumstances such as the ones described above. These rules are not arbitrary, but rather reflect the considered judgment of legislators, judges, and commentators regarding the likely intent of the contracting parties, taking into consideration the non-fungible nature of real property. *See, e.g.,* José María Manresa y Navarro, 10 *Comentarios al Código Civil Español* 174 (5th ed. 1950).[7]

For example, Art. 1225 requires that "[t]he object of every contract must be a thing determined with regard to its kind. The indetermination of the amount shall not be an obstacle to the existence of the contract, *provided* it may be possible to determine it without necessity of a new agreement between the contracting parties." P.R.Laws Ann. tit. 31, § 3423 (Official translation 1990) (emphasis added). In the same vein, Art. 1360 provides that a statement of boundaries is "indispensable in every conveyance of real estate." P.R.Laws Ann. tit. 31, § 3820 (Official translation 1990); *see also* Quintus Mucius Scaevola, 23 *Código Civil* 83 (2d ed. 1970) ("not to express the boundaries, thus establishing an undefined real property, necessari-

ly uncertain, would make impossible its sale") (translation ours). Thus, a contract for the sale of land, "any land," without a specification of its location, would be invalid under the Civil Code for lack of an adequate "object." In contrast, a contract for the sale of a certain quantity of a fungible good, such as generic tennis balls, is complete in and of itself; the object of the contract is determinable without requiring subsequent agreements between the parties.

Arts. 1358–60 establish rules specifically designed to deal with the performance of a contract for the sale of real property. As noted above, Art. 1358 normally provides that when a sale of real property is made:

> "with a statement of its area, at the rate of a certain price for a unit of measure ..., the vendor shall be obliged to deliver to the vendee ... all that may have been mentioned in the contract;"

but it immediately goes on to state that:

> "*but should this not be possible,* the vendee may choose between a proportional reduction in the price or the rescission of the contract, provided that in the latter case the decrease in the real estate is not less than one-tenth (⅒) of the area given it." *Id.* (emphasis added).

Similarly, Art. 1359 provides for the eventuality in which:

> "[i]f in the case of the preceding section there is greater area or number in real estate than those mentioned in the contract, the vendee shall be obliged to pay the price of the excess if the greater area or number should not exceed one-twentieth (1⁄20) of those mentioned in the contract; but should it surpass said one-twentieth (1⁄20), the vendee may choose between paying the greater value of the estate or withdrawing from the contract."

P.R.Laws Ann. tit. 31, § 3819. Finally, Art. 1360 deals with sales of real property in

---

**7.** Manresa writes that "[o]ne of the functions of the civil law with regard to the matter of contracts is to procure the stability of the same without injury to any party's interests and without invading the proper sphere of the parties' free initiative.... To that purpose [the civil law] establishes useful rules, in order to presume what would have been the will, that was not

completely determined, of the parties; what that will would have been had the parties known of those new factual circumstances, and, finally, has recourse to equity, which is the law itself, so that the purposes of the juridical relationship created [between the parties] may be fulfilled and the development of the life of the law not be obstructed nor delayed." *Id.* (Translation ours).

which the price is set globally for the entire plot, instead of on a price-per-unit-of-area basis:

> "[i]n the sale of real estate made for a fixed price and not at the rate of a specified sum for a unit of measure ..., the increase or decrease of the same shall not be considered, even when greater or less area ... than that stated in the contract may be found."

P.R.Laws Ann. tit. 31, § 3820.

The point of these rules is to attempt to preserve the presumed will of the parties to the contract. If the sale is made for a fixed price, the object of the contract is presumed to be the plot of land in itself, regardless of its superficial extension. The rule's rationale is that, given that the price of a plot of land will likely depend on its acreage, by setting a fixed price the parties must have already arrived at their own determination of the area. All information thus being available at *the moment of executing the contract,* there is no reason to adjust the price afterwards if the area turns out to be different. As the Supreme Court of Puerto Rico once remarked, "[t]he law presumes, and not without logic, that the buyer could have, before perfecting the contract, assured himself of the extension and quality of the real property that he was attempting to acquire. If he did not do so, if even so he failed to object and [instead] consented to the acquisition, he will not be able to impute to anyone else his own fault." *Ruidíaz–Barrios v. Ramos,* 103 P.R.Dec. 922, 925 (1975) (citing Scaevola, 23 *Código Civil* at 82).

In contrast, if the sale is made for a given price per unit of area, the object of the contract is a combination of both the quantity and the price. Moreover, a contract so fashioned indicates that the parties were not certain of the area comprised within the boundaries of the land being sold. The rules set by Articles 1358 and 1359 are based on the presumption that the parties placed roughly equal importance on both the quantity and the price. Thus, with the aim of giving effect to the parties' intent, these articles provide that if the excess or shortfall is moderate, the contract will be preserved, albeit with a modification of the total sale price. The rescissory remedy is available only when the variation in area is substantial, the threshold being set somewhat arbitrarily at a 10% shortfall or a 5% excess in area.[8] As Castán–Tobeñas remarks,

> "[t]he Code supposes ... that with such a notable reduction in area, perhaps the transaction would not be convenient for the buyer, who, if he had known of this in time, perhaps would not have given his consent to the contract; but not desiring to substitute the parties' intent, grants the buyer the freedom to choose, according to his convenience, either to preserve the contract, albeit with a reduction in price, or to rescind the sale."

4 *Derecho Civil Español, Común y Foral* at 115 (translation ours); *see also* Scaevola, 23 *Código Civil* 78 (2d ed. 1970) (noting that the rescissory remedy for excessive shortfalls or surpluses was added to the Code for the first time in 1882).[9]

The question that concerns the Court in this case, however, is a very narrow one; namely, what circumstances trigger the phrase "but should this not be possible" found in Art. 1358. Although it does not present a particularly difficult or controver-

---

**8.** That the thresholds are different, however, is not arbitrary, but rather grounded in considerations of equity. It is reasonably presumed to be easier for a buyer to bear the loss of an expected opportunity to utilize a certain quantity of land than to be forced to pay more than what he or she originally budgeted for. Castán–Tobeñas notes, with some understatement, that "an unforeseen increase [in price] can be difficult for the buyer." 4 *Derecho Civil Español, Común y Foral* at 15.

**9.** Articles 1358 and 1359's provenance has been traced back to a fragment from the Roman legal commentator Paul: "Qui agrun vendebat dixit fundi iugera decem et acto esse, et quod eius admensum erit, ad singula iugera certum pretium stipulatus erat; viginti, inventa sunt el; pro vigenti debem pecunian respondit." *Digest* 18, 1, 40, 2. A rough translation into English would be: "If he who sold the plot of land said it had eighteen yokes [a measure of land], and it was stipulated that it would be paid at a certain price per yoke; twenty were found; then twenty would be paid for said I." Note that, according to Roman law, the buyer did not have the option to rescind the contract, even when the surplus of land exceeded 5%.

sial issue, this phrase is not much discussed by the relevant authorities. The Supreme Court of Puerto Rico has never interpreted that particular phrase. In fact, it has mentioned Art. 1358 only three times in the reported cases. *B & W Investment v. Soc. de Gananciales,* 104 P.R.Dec. 152 (1978) (Negrón García, J.); *Velázquez–Torres v. Velázquez–Morales,* 82 P.R.Dec. 619 (1961); *Fernández v. Falú,* 41 P.R.Dec. 864 (1931). Similarly, most commentators have mentioned it only in passing. Scaevola goes into greater detail than most in writing that "[i]t not being possible, *for some rational, not arbitrary, motive* for the seller to deliver [the entire amount agreed to], the buyer is given two options." Scaevola, 23 *Código Civil* at 78 (translation and emphasis ours).

▆▆▆ Nevertheless, the interpretive gap is not so substantial as to require certification to the Puerto Rico Supreme Court.[10] The standard for certifying questions of state law is well-established. "Absent controlling state court precedent, a federal court ... may certify a state law issue to the state's highest court, or undertake its prediction 'when the course [the] state courts would take is reasonably clear.'" *VanHaaren v. State Farm Mutual Automobile Insurance Co.,* 989 F.2d 1, 3 (1st Cir.1993) (citing *Porter v. Nutter,* 913 F.2d 37, 41 n. 4 (1st Cir.1990)). *See Lareau v. Page,* 39 F.3d 384, 390 (1st Cir.1994) (citing *VanHaaren,* 989 F.2d at 3); *Lyons v. National Car Rental Systems, Inc.,* 30 F.3d 240, 245 (1st Cir.1994) (same)).

However, although "[t]he decision to certify a question of law to the local court is discretionary," *Ruiz Rodríguez v. Litton Industries Leasing Corp.,* 574 F.2d 44, 46 (1st Cir.1978) (citing *Lehman Brothers v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974); *Fornaris v. Ridge Tool Co.,* 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970)); *Oliveras–Salas v. Puerto Rico Highway Authority,* 884 F.2d 1532, 1535 (1st Cir. 1989); *In re Puerto Rico Electric Power Authority,* 687 F.2d 501, 504 (1st Cir.1982); it is nevertheless "inappropriate for a federal court to use such a procedure when the course state courts would take is reasonably clear." *Bi–Rite Enterprises, Inc. v. Bruce Miner Company, Inc.,* 757 F.2d 440, 443 n. 3 (1st Cir.1985) (citing C. Wright, A. Miller, E. Cooper, 17A *Federal Practice and Procedure* § 4248 (1978)).[11]

Although the question before the Court is a question of Puerto Rico law, and its resolution will determine the outcome of the case, it is not an unclear question of law.[12] To the contrary, the interpretation of Art. 1358 that would be selected by the Puerto Rico Supreme Court may be predicted without much difficulty. Both statutory analysis and the overarching purpose of Arts. 1358–60 point toward the same interpretation; namely, that "but should this not be possible" refers to a lack of space in the given parcel of land, rather than to some nebulous concept of 'impossibility.' First, although the Art. 1358

**10.** Although no party has requested certification, the Court raises the issue *sua sponte.* The Court also considered and rejected the possibility of abstaining from deciding this case because of unclear state law pursuant to the doctrine set forth in *Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); as discussed in the following pages, the state law issues are clear enough to make abstention unnecessary. Furthermore, even if the relevant state law were unclear, it is questionable whether abstention would be preferrable to certification, given that certified cases are usually resolved more expeditiously and that the federal court never surrenders jurisdiction over the case.

**11.** The Puerto Rico Supreme Court considers the same factors in determining whether it should accept jurisdiction over a certified question. P.R.R.Civ.P. 53.1(c), P.R.Laws Ann. tit. 32, App. III, R. 53.1(c) (Official translation 1983), provides, in pertinent part, that:

"[a] petition for certification is also perfected when ... any Federal District Court ... requests, by filing the proper application with the clerk of the Supreme Court of Puerto Rico, a finding on local issues of law which are determinant to the cause of action brought before its consideration, which issues have no clear precedents in the decisions of the Supreme Court of the Commonwealth of Puerto Rico."

*See also Pan American Computer Corp. v. Data General Corp.,* 112 P.R.Dec. 780, 788 (1982) (interpreting Rule 53.1(c)); *In re San Juan Dupont Plaza Hotel Fire Litigation,* 687 F.Supp. 716 (D.P.R.1988).

**12.** The very scarcity of commentary, both judicial and academic, also suggests that experts on the Civil law consider the matter to be simple enough.

language has not been interpreted, Art. 1360 contains language which is not only similar, but has also been the subject of judicial and academic commentary. Second, any other interpretation for Art. 1358's language would yield results inconsistent with the framework established by the Code's provisions on the performance of contracts.

First, Art. 1360 contains a second paragraph dealing with the sale of two plots of land for one fixed price whose text provides a clue to the interpretation of Art. 1358's "but should this not be possible" language. This second paragraph reads:

> The same shall take place when two or more estates should be sold for a single price; but, if besides mentioning the boundaries, which are indispensable in every conveyance of real estate, their area [or] number should be designated in the contract, the vendor shall be obliged to deliver all that is included within said boundaries, even when they exceed the area or number specified in the contract; and, *should he not be able to do it,* he shall suffer a reduction in the price, in proportion to what is lacking in the area or number, unless the contract be annulled by reason of the vendee not accepting the failure to deliver what had been stipulated.

P.R.Laws Ann. tit. 31, § 3820 (Official translation; emphasis added). This paragraph adds a peculiar provision that contains elements of both Art. 1360's 'as is' rule and Art. 1358's proportional reduction rule. The resulting hybrid, in a nutshell, establishes that in sales of two plots for one fixed price, if the total area is also fixed by contract, then the risks of a variation in area will be borne by the seller. Just as under Art. 1360's first paragraph, even if the total area is greater than agreed, the buyer may keep the land without paying more. But just as under Art. 1358, if the total area is less than agreed,

then the buyer may require a proportional reduction in price.

Art. 1360's second paragraph becomes interesting at the juncture marked by the phrase "should he not be able to do it." This language refers to the seller's ability to deliver "all that is included with said boundaries," just as Art. 1358's "but should this not be possible" refers to the seller's ability to deliver to the vendee "all that may have been mentioned in the contract." Unlike Art. 1358's, Art. 1360's language has been interpreted by the Supreme Court of Puerto Rico. In *Rosa Valentín v. Vázquez Lozada,* 103 P.R.Dec. 796 (1975), the Court held that Art. 1360's "should he not be able to do it" referred to a shortfall in the area comprised within the boundaries of the parcel of land sold, thus siding with Scaevola in a controversy that has arisen between various commentators to the Civil Code.[13] *See* Scaevola, 23 *Código Civil* at 91 ("[w]hat the phrase 'and should he not be able to do it' means, in our opinion, is that" ... "the seller is unable to perform according to the literal sense of the contract" ... "because there is a smaller area within the boundaries than expressed in the contract."); José Puig–Brutau, 2 *Fundamentos de Derecho Civil* 169 (2d ed. 1982). *But see* Manresa, 10 *Comentarios al Código Civil Español* at 184 ("if it later turns out that [the seller] cannot deliver everything, because, for example, a part, a building, a valley, ..., a ravine, etc., are not his, the sale of a certain body is denatured since what is sold is not what was agreed").

Second, to conclude that Art. 1358's language should be interpreted differently from Art. 1360's would be inconsistent with the rationale underlying the two articles. As discussed above, one of the consequences of the fact that land is not a fungible good is that *all* sales of land must identify the land by establishing boundaries. To deliver title to a plot of land not originally subject to the contract of sale, in order to complete perfor-

---

13. Technically, the Court's comments did not constitute a holding but were merely dicta. The case involved the question whether an option contract for the sale of land was to be regulated by the Civil Code provisions on the contract of sale or the general law of contracts and obligations. The Court held that the performance of an option contract of sale, that is, the perfor-

mance of the duty to enter into a subsequent contract of sale, fell within the law of obligations, thus rendering Arts. 1358–60 inapplicable. Nevertheless, the Court saw fit to discuss Art. 1360's "should he not be able to do it" language in length and detail, which suggests that those pronouncements should not be taken lightly.

mance, is, in a way, to sell land without established boundaries. As such, that part of the sale would be invalid for lack of agreement between the parties as to the 'object' of the sale.

This Court concludes that Art. 1358's phrase, "but should this not be possible," should be interpreted in a manner harmonious with the interpretation chosen by the Puerto Rico Supreme Court for Art. 1360's "and should he not be able to do it." Just as in Art. 1360's second paragraph, in Art. 1358 a plot of land is sold with defined boundaries and with an expression of the area to be sold. The remedy for a shortfall in area is in both cases almost identical: a proportional reduction in the purchase price, and even rescission under certain circumstances. These statutory remedies are designed to preserve the parties' intent, which in both cases includes not only boundaries but also area. Under the Puerto Rico Supreme Court's interpretation of Art. 1360's second paragraph, a buyer cannot demand that the seller deliver land situated elsewhere to replace the area not available within the agreed boundaries. He may only seek a reduction in price. *Rosa Valentín v. Vázquez Lozada*, 103 P.R.Dec. at 802. It should be no different for sales of land falling under Art. 1358.

## B. The La Ponderosa Parcel

The contract for the sale of the La Ponderosa parcel was a price-per-unit-of-area contract, subject to the provisions of Arts. 1358 and 1359, and not a 'certain body' contract, subject to Art. 1360. Both the Option Contract and Deed No. 75 provided for the sale of a certain parcel of land, not at a fixed, global price, but rather at the rate of a certain price per unit. Moreover, both contracts required the buyer, La Ponderosa, to carry out a survey, at its expense, a requirement that would be unnecessary if the contract fell under Art. 1360.

■ Notwithstanding the provisions of Arts. 1358–60, however, the parties validly provided by contract for slightly different rules. The Supreme Court of the Commonwealth of Puerto Rico, in *B & W Investment v. Sociedad de Gananciales,* wrote that "the only justification for the existence in the Code of the articles in question ... is to supply the will of the parties in the absence of an agreement." 104 P.R.Dec. 152, 157 (1975) (Negrón García, J.). Similarly, as one Puerto Rican commentator noted, the parties to a contract for the sale of land may "take precatory measures and agree over what shall be the consequence of discovering after a survey an excess or shortfall in area. In such a situation, the contractual agreement would prevail over Art. 1358, which must always be considered to be supplementary to the will of the parties." José Ramón Vélez–Torres, 4 *Curso de Derecho Civil* 170 (1990).

The Bankruptcy Court found, and neither party disputes, that Mr. Helfeld specifically negotiated a clause in the contract which would have protected him from having to purchase more than 340 cuerdas, if the La Ponderosa parcel was later found to be larger. This clause was valid and had the effect of preempting Art. 1359's provisions regarding the buyer's obligation to pay extra up to a 5% excess in area.

However, nothing was provided for the possibility that the parcel might contain less than 340 cuerdas. So much La Ponderosa, itself, admits. The omission is explained as the result of both parties' conviction that the parcel was at least 340 cuerdas. La Ponderosa also adds that Mr. Helfeld understood that under Art. 1358, he was entitled to receive the full 340 cuerdas and thus had no need for concern.[14]

■ Notwithstanding Mr. Helfeld's private understanding, because it is undisputed that the parties made no provision for a shortfall, the strictures imposed by Art. 1358 are fully applicable to the case at hand. As discussed above, Art. 1358's *quanti minoris* and *redhibitory* remedies become available when the parcel sold is discovered to cover a lesser area than agreed. There is no specific performance remedy for the sale of land

---

**14.** The Bankruptcy Court wrote that "[t]he reason why deed number 75, the deed of sale, was executed without the parties knowing, or the notary verifying, the exact measurement of the tract of land being sold has not been explained. The parties opted not to present the testimony of the notary." This Court cannot but share the Bankruptcy Court's puzzlement.

whereby the seller could be compelled to deliver additional land outside of the boundaries of the parcel that was sold.

 The Court's conclusion is not altered by the fact that the additional land sought would be extracted from a contiguous parcel also owned by the estate in bankruptcy. That second parcel was identified, demarcated, and segregated in the same document which identified the La Ponderosa parcel.[15] The parcel was thus specifically excluded from the contract of sale. It would do violence to the parties' intent to subsequently undo the segregation part of the agreement and transfer over 70% of the second parcel to the La Ponderosa parcel.

## V. Conclusion

For the foregoing reasons, the Bankruptcy Court's order of January 8, 1990, is affirmed. Specifically, the Court affirms the Bankruptcy Court's determination that Civil Code Art. 1358 does not entitle La Ponderosa to receive any acreage outside of the boundaries of the lot that was the object of the parties' dealings. To the contrary, in a case such as this one, in which the land delivered turns out to have less than 90% of the acreage promised in the contract of sale, Art. 1358 grants the purchaser only two options: either demanding a reduction in the total sale price, or of rescinding the contract in its entirety. La Ponderosa having paid the reduced price and thus rejected rescission, no other remedies remained for the Bankruptcy Court to confer.

It is so ordered.

---

**15.** It should be noted that the segregation made sense at the time the contract was entered into; the quality and location of the second parcel was more appropriate for light industrial use rather than for residential development, which was La Ponderosa's stated purpose in purchasing its parcel.